## Chesapeake & Ohio Railway Company v. Kelly's Administratrix.

(Decided October 15, 1914.)

### Appeal from Montgomery Circuit Court.

1. Railroads—Derailment.—When a badly worn and beveled rail concurs with a rigid truck and a bald driver locomotive, it is not an unwarranted deduction to account for a wreck in that way, when no other explanation is offered.

2. Railroads—Proof of Previous Derailment.—It was competent to admit evidence of a derailment before this one if conditions were the same, so as to show knowledge on the part of appellant of the danger.

3. Railroads—Accident Caused From Derailment of Engine—Evidence.—It was a subject of legitimate inquiry whether before the

accident, engines such as the one in use were being discarded or had become obsolete, in order to support appellee's theory that appellant knew the danger in their use.

4. Railroads—Action for Death—Expectancy—Instructions.—The instructions being right in form and principle, evidence examined and held to authorize a verdict for $19,011.00 where the decedent had an expectancy of 22 years and was earning $192.00 per month.

SHELBY, NORTHCUTT & SHELBY and L. APPERSON for appellant.

O'REAR & WILLIAMS for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

On the morning of June 28th, 1911, one of appellant's eastbound passenger trains was derailed two miles east of Aden, in Carter County. There was a curve of about eight degrees at the point where the derailment occurred. The curve bent toward the right, and the left-hand or outside rail was, therefore, the higher. The wheel of the engine truck climbed this left-hand rail. The engine ran upon the ties some 300 feet, and then left the roadbed entirely, going down an embankment. The engineer, Matt Kelly, was caught under it and killed.

Kelly had been in the employ of appellant for 20 years continuously, and for most of this time serving as a locomotive engineer. He was 48 years old and left surviving, and dependent upon him, a wife, age 45, and five infant children. He was earning $192.00 per month as engineer, and was an intelligent and industrious man, steady, sober and frugal in his habits.

This action was brought under the Federal Employers' Liability Act to recover the damages sustained by his widow and children. There have been two trials. On the first, there was a verdict for $18,000, but this was set aside in the lower court. This appeal is from a judgment rendered on a verdict in the second trial for $19,011.00.

The verdict was as follows:

"We, the jury, find for the plaintiff in the sum of $19,011.00; to be proportioned as follows: Mrs. Addie Kelly, $7,040; Carroll Kelly, $1,288; Matt L. Kelly, $1,580; Ruth Kelly, $2,273; Tom Kelly, $4,371; Richard Kelly, $2,459. Total, $19,011."

The basis of recovery was the alleged negligence of the railway company with reference to the engine and its equipment, and defects and insufficiencies of the roadbed, rails and ties.

The evidence of appellee went to show that this left-hand or outside rail on the curve was defective and dangerous in that the top or "ball" of it, which was climbed by the engine, was worn, that is, beveled off, beyond the point of safety. By the constant wear of car-wheels against it in turning the curve, this outside rail was beveled on the inside to as much as 45 degrees from a vertical, as the testimony of some of the witnesses shows. A section of the rail is before us. The beveled surface is steeper than 45 degrees, perhaps not more than 20 degrees, but it is so worn that the point of the bevel on top of the rail is even with an extended line of the "web" or upright part of the rail. This rail-section didn't come from the rail where the engine left the track. It was supplied by appellant, and came from some other rail in that curve, but for purposes of this case, we will assume that none of them were worn or beveled any more than this. The engine was No. 143, and had been in constant use since 1892. It was built with a flangeless front driving wheel, or, as referred to by some of the witnesses, a "bald" driver. The pony truck at the front of the engine had four wheels. This truck is known as the rigid center-plate type. Modern engines are equipped with the swinging center-plate. The modern swinging center-plate, as the name implies, is one which has a lateral motion instead of being fixed, and which, therefore, moves laterally or "gives" to the rail as the engine tracks the curve. The pony truck under this engine was of the rigid, solid-casting center-plate type. The proof of appellee goes to show that a locomotive and train of cars running on a straight track have a tendency to continue their straight course when reaching a curve in the track, and would do so but for the flanged wheels operating against the outer rail of the curve. The first wheel to meet this resistance of the curve is the front wheel of the pony truck, and it, therefore, receives the first shock. Of course, the sharper the curve and the higher the speed, the greater the burden on both flange and rail. A less rigid truck obviously will conform more easily to the curved track, and a sound, unworn outside rail will, of course, offer more resistance to the flange on any type of truck. With the

natural tendency of an engine at high speed to lift or climb the outside rail of a curve, then if that rail is worn, that is, beveled out, it becomes a saucer or bowl-like floor upon which the flange rim rests. Then there is an easy grade for the wheel to mount the rail. The beveled rail need not be worn to the breaking-point—it might be perfectly safe on a straight track—it would stand any strain to which it is there subjected—but at a curve it is entirely likely that it acted in the same way that a derailer does to safeguard the main track from a wild car on the siding.

Appellee proves and argues that the more flanges that can be presented against the outer rail, that much less likely will the train be to leave the track, and in this way, it insists, there was further negligence in continuing to use the "bald" driver. It is undisputed that engines with "bald" drivers and rigid trucks are not now being constructed and have not been for many years, and at the time of this accident only three of them were left on this road. But the proof of appellant shows that this change in type of engine—the use of the swinging center-plate instead of the rigid pony truck, and the use of a flanged drive wheel instead of the "bald" driver—has come principally as a large and heavier type of engines began to be employed.

Its witnesses admit that the rigid truck and the "bald" driver under the modern heavy engines would be dangerous and unsafe, but swear there is nothing dangerous in their use under a lighter engine, like No. 143. They also swear that the worn condition of the rail above referred to is not dangerous. About a year before this, engine No. 143 went into the ditch near Leon Tunnel, and the proof shows on a curved track like that shown at this time. Complaint and criticism were then made by employes to appellant's officials in charge of such equipment that the engine was deficient and dangerous for the reasons above named.

Appellant is frank to say that it can not account for this derailment, and is unable to offer any explanation of it. It contends that it is merely one of such accidents as are constantly occurring in railroad history, notwithstanding the exercise of great care. It may be true, that this engine No. 143, with the rigid truck and "bald" driver would safely track an eight-degree curve if the outside rail be in good condition, but when a badly worn and beveled rail concurs with the rigid truck

and "bald" driver of this engine, it certainly is not an unwarranted deduction to account for the wreck in that way.

The facts going to support appellee's theory of neg· ligence were testified to by numerous witnesses, among them engineers and others experienced in railroading. There is no material dispute as to the rigid pony truck and the worn rails. Appellant's witnesses, however, do controvert the theory of the accident as resulting from these proven facts. While they, too, are men of railroad experience and responsibility, yet the conflict as to cause is none the less one of fact, and unless the instructions are erroneous the jury's verdict should not be disturbed. But, before coming to a consideration of the instructions, we will notice appellant's objection made to the introduction of certain evidence.

It is insisted that it was erroneous to permit proof of derailment of this engine at Leon Tunnel before this accident. It argues that this trial was to ascertain the cause of the derailment in which Kelly was killed, and that proof of the Leon Tunnel accident could have no probative effect on this question, but rather tended to inject a collateral issue. Appellant concedes, however, that this testimony might be competent if the conditions under which the several derailments took place were the same. The proof did show that at Leon, there was a curve; the outside rail was worn; and it was this same engine with its rigid truck and "bald" driver running at about the same speed. These are the elements which appellee contends caused the wreck when Kelly was killed. Appellant has insisted through this trial that such conditions did not cause the derailment. We think it was competent under the circumstances to show that like conditions did produce a like result, and in that way bring home to appellant knowledge of the danger in operating engine No. 143, if the rail is worn at a curve. We are of the opinion that the authorities relied on by appellant in support of its objection are not applicable. Hughes, &c. v. General Electric L. & P. Co., 107 Ky., 485, was to recover damages for injury to *residence property* from the Electric Company's nearby ma-chinery, in the way of cracked plastering, rattling windows and doors, and causing the house to vibrate. The court refused to permit proof that other dwellings in the same vicinity were similarly affected, because her action was to recover damages for injuries to her house from

the operation of the plant—not necessarily negligent—and its effect upon that house and not others was the proper subject for investigation. If in the extraordinary use of one's property, one's neighbor suffers injury to property, he is liable whether or not he knew it was likely to produce such results.

Appellant objects also to the line of proof going to show that appellant for several years before the accident had not been purchasing engines with "bald" drivers or rigid trucks. This is not testimony relating to changes made in appellant's track or equipment after the accident, and, therefore, the cases of L. & N. R. R. v. Morton, 121 Ky., 398, and L. & N. v. Stewart, 131 Ky., 665, are not applicable. It was a subject of legitimate inquiry, whether before the accident these engines were being discarded or had become obsolete, in order to support appellee's theory that appellant knew the danger in their use. It was for the jury to determine, on this question of notice, whether their disuse was because they were unsafe or merely because they were of too light draft.

Appellant complains that the court refused to give its instruction "B" to the effect that the appellant was not negligent if the condition of the rails, the character of the engine truck, and front driving wheels, at the time of the accident, were such as were generally approved with reference to safety by the "expert judgment of men of experience and knowledge in railway construction and engine mechanism." In our opinion, appellant's negligence in this case is not measured so much by the opinion of its experts and employes, as by whether the track and appliances were such as one who is reasonably careful and prudent, would use or maintain under the circumstances of their use. An instruction was given by the court which submitted the question of negligence and ordinary care and prudence as follows:

"(8) The jury is instructed that a railway company is not an insurer of the safety of its employes, but is bound only to use ordinary care to provide for them a reasonably safe place in which to work, and reasonably safe implements and appliances with which to work.

"In this case the jury are instructed to find for the defendant, unless they believe from all the evidence before them—First, that the accident in question was di-

rectly and proximately caused by an unsafe condition of the rail over which the engine climbed or by a defective condition of the engine as respects its front driving wheels or the character of its truck, or by a defective condition of the ties at the place of derailment, or by a combination of said conditions; and, secondly, that such of said conditions as may have existed were due to a failure on defendant's part to exercise ordinary care in respect thereof."

Appellant's chief objection is to instructions Nos. 4 and 5, which are as follows:

"(4) If the jury should find for plaintiff, they should fix the damages at such sum as would reasonably compensate the dependent members of the family of said Kelly, if any there be, for the pecuniary loss, if any, shown by the evidence to have been sustained by them because of said Kelly's injury and death. In fixing said amount, the jury are authorized to take into consideration the evidence showing the decedent's age, habits, business ability, earning capacity, probable duration of life; and also the pecuniary loss, if any, which the jury may find from the evidence that the dependent members of his family, if any, have sustained because of being deprived of such maintenance or support or other pecuniary advantages, if any, which the jury may believe from the evidence, they would have derived from his life thereafter."

"(5) If the jury find for the plaintiff they will find a gross sum for the plaintiff against the defendant which must not exceed the probable earnings of Mat Kelly had he lived. The gross sum to be found for plaintiff, if the jury find for the plaintiff, must be the aggregate of the sum which the jury may find from the evidence and fix as the pecuniary loss as above described, which each dependent member of Mat Kelly's family may have sustained by his death, stating the amount awarded his widow, Addie Kelly, Mat L. Kelly, Ruth Kelly, Thomas J. Kelly and Richard Kelly, if any for them, or any of them, but such findings in the aggregate must not exceed $32,000.00 dollars. They will not find any sum for Sylvester Kelly. In other words, if the jury find for the plaintiff, you must in your verdict state also the respective amounts awarded each dependent member of decedent's family, &c."

Appellant insists, under the principles of Gulf & Colorado Railway Co. v. McGinnis, 228 U. S., 173, 57 L.

Ed., 785, and Mich. Cent. Co. v. Vreeland, 227 U. S., 59, 57 L. Ed., 417, that what the beneficiary is entitled to is not a lump sum equal to what he would receive during the estimated term of dependency, but the present cash value of such aggregate amount. In other words, the amount awarded ought to be such that if placed at interest, would be wholly consumed when the time of dependency ceases, and that the jury should have been so instructed.

In the McGinnis case, *supra,* the court construes the Employers' Liability Act to provide compensation to certain surviving relatives of the employe, "for the actual pecuniary loss resulting to the particular person or persons for whose benefit an action is given." With reference to the apportionment of the benefit of each, the jury must do this, "measured by his or her individual pecuniary loss." We are unable to see that the McGinnis case, *supra,* either in principle or by intimation, requires that the measure of damage in the instruction to juries should be any different from the one in this case. In fact, the instructions, as above quoted seem to have been drawn to conform to the principles announced in the McGinnis case.

The instructions limited recovery to the actual "pecuniary loss." Their whole loss was sustained at the time of his death. There is no more reason in appellant's theory, that the defendants should have discounted the loss, than there is that the Railroad Company should be adjudged to pay a fixed sum annually, semi-annually or monthly for their support. The award of the jury should be for the pecuniary loss suffered. While that loss is, in a measure, future support, the father's death precipitated it, so that it is all due, and we are not impressed with the argument that the sum due should be reduced by rebate or discount. The value of a father's support is not so difficult to estimate, and the average juryman is competent to compute it, but to figure interest on deferred payments, with annual rests, and reach a present cash value of such loss to each dependent is more than ought to be asked of any one less qualified than an actuary. We believe the instructions are not only right in form and in principle, but are in harmony with the McGinnis case.

Appellant also claims that the damages awarded are excessive. This claim goes again to the instructions we have just considered. The argument is based upon the

idea that the whole amount which the jury believed was the pecuniary loss, was awarded in a present lump sum for each dependent. It is pure speculation as to how the jury reached the exact figures named in the verdict. They may have felt that the total loss was more than that, and did discount it at its present cash value. The same objection could as well have been made had the verdict been $15,000, or $10,000.

Matt Kelly's life expectancy at the time of his death was 22 years, and he was earning $192 per month. Mrs. Kelly had a like expectancy. The children were aged as follows: Carroll, 16; Matt, 12; Ruth, 10; Tom 8 (afflicted physically) and Richard, 3. When the total sum allowed by the jury is but approximately two-fifths of the gross earnings of Matt Kelly for the probable duration of his life, and in view of the standard of living set by him for his family—the educational advantages which he gave them—we do not believe it can be said that the amount allowed is excessive. So. Ry. v. Bennett, 233 U. S., 80, Adv. Sheets, May 15, 1911.

The judgment of the lower court is, therefore, affirmed.