## Louisville & Nashville Railroad Company v. Grant.

(Decided February 10, 1928.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Third Division).

1. Master and Servant.—Doctrine of res ipsa loquitur is applied as between master and servant only in extreme cases, and mere fact of happening of accident does not warrant its application, unless instrumentality producing injury is shown to have been under master's control.

2. Courts.—Rule of federal courts relative to application of doctrine of res ipsa loquitur in cases arising between master and servant under Federal Employers' Liability Act (45 USCA secs. 51-59 [U. S. Comp. St. secs. 8657-8665]) governs decisions of state courts in actions under Federal Employers' Liability Act.

3. Courts.—State court is under duty to follow rulings of highest federal court in action arising under federal statute.

4.  Master and Servant.—Railroad held not liable, in action under
    Federal Employers' Liability Act (45 USCA secs. 51-59 [U. S.
    Comp. Stats., secs. 8657-8665]), to head brakeman maintaining
    lookout in cab of engine of freight train for injuries resulting
    from the projection of some unknown hard substance through
    the windstorm shield of the cab when another train was passing,
    where evidence failed to disclose nature of object or any defec-
    tive condition in other train, on which railroad's negligence could
    be predicated, since application of doctrine of res ipsa loquitur,
    even if otherwise applicable, was precluded by rule adopted in
    federal courts requiring proof of negligence in action under the
    act.

ASHBY M. WARREN and WOODWARD, WARFIELD & HOBSON
for appellant.

R. F. PEAK and PEAK & PEAK for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Revers-
ing.

On March 31, 1926, the appellee and plaintiff below,
John B. Grant, was serving the appellant and defendant
below, Louisville & Nashville Railroad Company, as
head brakeman on one of its freight trains going east
from Louisville, and his position while the train was run-
ning was in the cab of the engine on a seat next to the
window, through which he could maintain a lookout
ahead.  Besides the glass window there was an equip-
ment attached thereto which is referred to in this record
as the windstorm shield, and which was designed to
protect the one maintaining the lookout when the window
itself was opened.  For some distance out of Louisville
defendant maintains a double track a sufficient distance
apart to leave a space between cabs of passing engines
and between the outside walls of the cars of from four to
five feet.  It was late in the evening, and practically dark,
and, while plaintiff's train was passing another one
going in the opposite direction on the other track, and on
the side where he was sitting, some unknown object
struck, raked, or scraped the windstorm shield immedi-
ately in front of him with such force as to break the glass
therein as well as its framing, and threw the glass into
the cab, a small piece of which struck him in his right
eye, destroying the sight, and which was afterwards re-
moved because of the effects of the wound.  He received
other slight injuries, none of which was of a serious
nature.  This ordinary action was filed by him in the

Jefferson circuit court against defendant to recover damages for his injuries upon the ground that, while he was in the performance of his duty at the place assigned him, and after the other freight train had passed the cab about half its length, "some heavy, hard, and dangerous substance attached to, or projecting from, the passing train, struck the engine in the cab of which this plaintiff was riding, and then struck the glass windstorm shield of the cab in which this plaintiff was riding with such force that said glass and particles thereof struck this plaintiff on the side of the head and his eye," etc.

An amended petition averred that the cars of the passing freight train were defective and dangerous, and known to be so by defendant, or could have been known by the exercise of ordinary care, and by reason thereof, the windstorm shield was broken, and plaintiff sustained his injuries in the manner indicated. The answer was a denial, with pleas of contributory negligence and assumption of risk. Appropriate pleadings made the issues, and the jury, under the instructions given by the court, returned a verdict in favor of plaintiff for the sum of $8,040. Defendant's motion for a new trial was overruled, and from the judgment pronounced on the verdict it prosecutes this appeal, relying upon a number of alleged errors, among which was the refusal of the court to sustain its motion for a peremptory instruction in its favor made at the close of plaintiff's testimony, and again at the close of all the testimony.

In disposing of that question, it becomes necessary to state the substance of the testimony upon the question as to how the injuries to plaintiff occurred. He testified that at the time he was in front on the seat on the left-hand side of the cab of the engine pulling his train engaged in looking out ahead through the window immediately in front of him, which was opened, but protected by the windstorm shield; that his train was running about 15 miles per hour, and he "judged" that the passing one was running about 25 miles per hour, and that, after 10 or 12 of its cars had passed his cab, "the engine (in which he was riding) was sideswiped, and cut the windstorm shield off, threw it in, struck me on the head," injuring his eye and face. It was but a short distance from La Grange where his train was stopped, and he was taken into the "H. K. Tower" located there, and received first medical aid. He then described his injuries and sufferings and the treatment he subsequently underwent,

none of which are pertinent to the question now under consideration. He stated that he first saw the passing train when its engine was in about 300 yards of the one on which he was riding; but he nowhere testified that he saw the object that struck the windshield, and, consequently, did not know whether it was attached to, or in any manner emanated from, the passing train, although he was on the lookout ahead, as was his duty.

The fireman, who was introduced by plaintiff, was standing in the cab back of him, and on the same side he was riding, was asked and answered, on the point under consideration, these questions:

"Q. I will get you to tell the jury whether or not anything struck your engine outside of the windstorm shield? A. No, sir. Q. Did you look at it to see. A. Yes, sir. Q. Were there any marks on your engine? A. None whatever. Q. Was there any parts of that windstorm shield left? A. The back part of the frame. Q. That was the upright strip of the frame? A. Yes, sir. Q. Did you see anything wrong with that train that passed you? A. No, sir. Q. Did you see anything projecting from it? A. No, sir. Q. You said a minute ago that 'we inspected the engine.' Who do you mean 'we'? A. Well, I did. Q. Was anybody with you? A. Not at the time I looked at it, no. Q. Did the flagman, Martin, inspect that engine? A. Not that I know of. Q. Did you see him inspect it? A. No, sir. Q. Did he call your attention to anything there? A. None whatever."

The engineer, who was also introduced by plaintiff, stated that "something struck my engine and struck Grant in the face," but that he did not see what is was either before or after it happened.

The rear brakeman testified that, after the train stopped at La Grange, he made some examination of the engine, and that he found a mark on its left side running up to the windstorm shield which did not cut the paint, but "it just made a hard straight mark like you take a stick and scratch a hard piece of wood," and that "from the looks, it was put on there when it knocked the window off." That witness was not on plaintiff's engine, but was elsewhere on the train at the time, and, of course, saw nothing that could have caused the accident. So that the only testimony in the case bearing upon the issue as

to how the accident happened was that given by plaintiff, the fireman, and the engineer. Within a short while the passing train stopped at East Louisville, some three or four miles from where the accident happened, and its engine and all of its cars were examined by three or four witnesses, and nothing was found to indicate in the remotest degree that any object attached to, or projecting from, that train produced the accident. Under such condition of the testimony it is strenuously insisted by defendant that it was entitled to the peremptory instruction it asked, and that the court erred in overruling its motion therefor; while plaintiff's counsel argue at great length and with much force that the proof as above outlined brings this case within the maxim res ipsa loquitur, but which argument is forcefully combated by counsel for defendant.

A large portion of the brief for both sides is taken up with a review of cases from this court wherein the maxim was invoked as between master and servant, and among the cases discussed are: L. & N. R. R. Co.v. Allen, 174 Ky. 736, 192 S. W. 863; L. & N. R. R. Co. v. Campbell, 186 Ky. 628, 217 S. W. 687; Ashland Supply Co. v. Webb, 206 Ky. 184, 266 S. W. 1086; and L. & N. R. R. Co. v. Mannin, 217 Ky. 460, 289 S. W. 1089. Many others are referred to in our opinions rendered in those cases, and from which it will be found that, contrary to the general rule, this court applies the maxim as between master and servant, but only in extreme and very much circumscribed cases, and in a very restricted sense.

In the Allen case, although it was recognized that some courts never apply the doctrine embodied in the maxim in cases between master and servant, yet that this court would apply it in a restricted sense, "where the thing which caused the injury is shown to be under the management or control of defendant or its servants, other than the one injured, and the accident is such as, in the ordinary course of things, does not happen, if those who have the management or control use proper care, slight circumstances pointing toward negligence on behalf of the defendant will authorize a submission of the question of its negligence to the jury. In other words, where the evidence shows that the accident is necessarily the result of defective conditions and can be explained upon no other reasonable hypothesis, circumstances indicating carelessness on the part of the defendant will produce a condition as to authorize a submission of the case to the jury."

In the Webb case the circumstances under which this court applies it as between master and servant were thus stated:

> "However, this doctrine (res ipsa loquitur) is seldom applied in cases between master and servant, and is only applicable where the evidence shows the accident is necessarily the result of defective conditions, and can be explained upon no other reasonable hypothesis."

Not only in the last two cases referred to, but likewise in all the others from this court, the evidence disclosed the identical instrumentality that produced the injury, and also established that such instrumentality was under the control, management, or possession of the defendant. Moreover, in all master and servant cases wherein we have applied the doctrine, as was done in the Allen case, there were additional facts and circumstances pointing, at least remotely, to negligence on the part of defendant, but which did not exist in either the Webb or the Mannin cases, and in neither of which was a recovery allowed.

The literal definition of the doctrine contained in the maxim is that "the thing itself speaks," but such literal definition is quite different from saying that "the accident itself speaks," as has frequently been argued, and occasionally but erroneously so construed by the courts. Concretely defined, the text in 20 R. C. L. p. 187, says:

> "More precisely the doctrine res ipsa loquitur asserts that whenever a thing which produced an injury is shown to have been under the control and management of the defendant, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care. It has been suggested that the application of the doctrine should be confined to cases where an instrumentality is *known* to have done a certain thing and a presumption therefrom that it was negligently kept, and that the doctrine cannot be invoked to prove the fact that an instrumentality did in actuality do any particular thing." (Our italics.)

It will therefore be seen that, in order to apply the maxim under the facts of this case, we are asked to do so from the *mere* fact of the *happening* of the accident, and which would require us to infer or conclude that it was produced by a cause in some manner under the management or control of, or produced by, the defendant and then to further infer or presume that such cause was the result of negligence on the part of defendant. In other words, we are asked to indulge an inference upon an inference. In the Allen case the breaking down of the trestle produced plaintiff's death, and in the Webb case the falling of the electric hammer produced the involved injury. Both the trestle and the electric hammer were instrumentalities under the control and management of the respective defendants, while in this case no one knows what was the instrumentality or defect, if any, that produced the accident and the consequent injury to plaintiff therefrom.

The case cited and relied on by plaintiff's counsel of P., C. C. & St. L. Ry. Co. et al. v. Grom, 142 Ky. 51, 133 S. W. 977, announces no contrary doctrine, since there were proven facts in that case tending to unerringly establish that the accident there complained of was produced by an instrumentality under the control of the defendant. Furthermore, it was a case involving the liability of the carrier for an injury to a passenger on its train, and in which relationship the doctrine of the maxim under consideration is always applied, even without the restrictions under which we apply it as between master and servant.

But counsel for defendant also insist that in this case, being one brought under the Federal Employers' Liability Act (45 USCA secs. 51-59 [U. S. Comp. St. secs. 8657-8665]), the federal rule with reference to the matter under consideration should prevail, and which rule is: That the doctrine without qualification does not apply as between master and servant, and which seems to be supported by opinions of the Supreme Court of the United States in the cases of, Patton v. T. & P. Ry. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361; Looney v. Metropolitan R. R. Co., 200 U. S. 480, 26 S. Ct. 303, 50 L. Ed. 564; N. O. & N. E. Ry. Co. v. Harris, 247 U. S. 367, 38 S. Ct. 535, 62 L. Ed. 1167, and by opinions in inferior federal courts in the cases of Am. Car & Foundry Co. v. Schachle-wich (C. C. A.) 229 F. 559; Canadian No. Ry. Co. v.

Senske (C. C. A.) 201 F. 637; and Patton v. I. C. R. R. Co. (C. C.) 179 F. 530  In the Schachlewich case the statement is made, "The maxim of 'res ipsa loquitur' does not apply where the relationship of master and servant exists," and which the writer of the opinion supports with citations of the Patton and Looney cases, supra. That being true, is it the duty of a state court to follow that rule of federal courts in a case arising under the federal statute?

It readily will be seen that the correct answer should be found in the federal opinions, particularly those rendered by the Supreme Court.  If that court refuses to adopt the same rule with reference to the application of the maxim that is adopted by a state court, and determines the question according to its own interpreted principles, then it becomes the manifest duty of state courts to follow such interpretation.  In disposing of this phase of the case we shall not enter into a discussion of procedural or remedial questions prevailing in a particular state, and which the federal court will follow, since to do so would require a lengthy and tedious discussion, and at the same time would be foreign to the concrete question under consideration.  We will therefore confine the discussion to the specific question, i. e., whether the federal courts, in actions arising under the Federal Employers' Liability Act, follow the prevailing rules of the respective states in similar actions as to the sufficiency, kind, and amount of testimony to authorize submission or sustain a recovery?

The Harris case, supra, from the Supreme Court of the United States, was one brought under the federal act now under consideration in a state court of Mississippi. The plaintiff succeeded in obtaining a judgment which was affirmed by the Supreme Court of that state, and the case was carried to the Supreme Court of the United States.  There was a statute of the state of Mississippi providing, in substance, that, in actions against railroad companies and others named therein, using engines, locomotives, and cars that were propelled by steam, electricity, gas, or gasoline lever power, and running on tracks, proof of injuries inflicted "shall be prima facie evidence of the want of reasonable skill and care of such railroad corporations," etc.  It will be perceived that the statute was in effect and substance a statutory adoption of the doctrine of the maxim res ipsa loquitur.  Under it

the plaintiff's case was submitted to the jury on certain essential facts, resulting, as we have stated, in a judgment in his favor. In reversing that judgment, the Supreme Court said:

"The federal courts have long held that where suit is brought against a railroad for injuries to an employee resulting from its negligence, such negligence is an affirmative fact which plaintiff must establish. The Nitroglycerine case, 15 Wall. 524, 537 [21 L. Ed. 206]; Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 663 [21 S. Ct. 275, 45 L. Ed. 361]; Looney v. Metropolitan R. R. Co., 200 U. S. 480, 487 [26 S. Ct. 303, 50 L. Ed. 564]; Southern Ry. Co. [Carolina Division] v. Bennett, 233 U. S. 80, 85 [34 S. Ct. 566, 58 L. Ed. 860]. In proceedings brought under the Federal Employers' Liability Act rights and obligations depend upon it and applicable principles of common law as interpreted and applied in federal courts; and negligence is essential to recovery. Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492, 501, 502 [34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475]; Southern Ry. Co. v. Gray, 241 U. S. 333, 339 [36 S. Ct. 558, 60 L. Ed. 1030]; New York Central R. R. Co. v. Winfield, 244 U. S. 147, 150 [37 S. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139]; Erie R. R. Co. v. Winfield, 244 U. S. 170, 172 [37 S. Ct. 556, 61 L. Ed. 1057, Ann. Cas. 1918B, 662]. These established principles and our holding in Central Vermont Ry. Co. v. White, 238 U. S. 507, 511, 512 [35 S. Ct. 865, 59 L. Ed. 1433], we think make it clear that the question of burden of proof is a matter of substance and not subject to control by laws of the several states."

The very recent case of Gulf Mobile & N. R. R. Co. v. Wells, decided January 3, 1928, and reported in 48 S. Ct. 151, 72 L. Ed.—, was another one brought in a state court of the same state, and in which the plaintiff, who was the servant of defendant railroad company, succeeded in obtaining judgment which was affirmed by the Supreme Court of the state. It was carried to the Supreme Court of the United States, and it reversed the judgment solely upon the ground that the Mississippi court administered erroneous rules pertaining to the character, *kind*, *amount*, or sufficiency of evidence to authorize a submis-

sion of the case to the jury under the rules adopted and applied by the federal courts in cases arising under the act. The reasons for that conclusion are thus stated in the opinion:

"It is unquestioned that Wells was at the time employed in interstate commerce, and that the case is controlled by the Federal Employers' Liability Act. Hence, if it appears from the record that under the applicable principles of law as *interpreted by the federal courts,* the evidence was not sufficient, in kind or amount, to warrant a finding that the negligence of the engineer was the cause of the injury, the judgment must be reversed. Seaboard Air Line R. Co. v. Padgett, 236 U. S. 668, 673, 35 S. Ct. 481, 59 L. Ed. 777, 781; Chicago, M. & St. P. R. Co. v. Coogan, 271 U. S. 472, 474, 46 S. Ct. 564, 70 L. Ed. 1041, 1042." (Our italics.)

The maxim is a "kind" of evidence, and it also furnished some "amount" of evidence.

Other pertinent cases from that court are Central Vermont R. R. Co. v. White, 238 U. S. 507, 35 S. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B, 252, and those in the excerpt above from the Wells opinion; the White case being cited in the Harris opinion.

It is needless for us to refer to cases to the effect that it is the bounden duty of a state court to follow such rulings of the highest federal court in actions arising under a federal statute. The duty of the state courts to do so is so thoroughly settled as to be familiar to all practitioners. If it were not done in cases requiring it, the winning litigant in the state court would receive but temporary gratification; for, if the case was one that could be reviewed by the federal courts, the loser could carry it there, and obtain a reversal, and thereby penalize the winner with the costs of such review as well as the costs in the state courts. We therefore feel constrained to hold that, even if it should be concluded that the evidence in this case authorized its submission under the restricted application of the res ipsa loquitur doctrine, heretofore adopted by us in cases between master and servant, our duty to follow the pronouncements of the federal court is imperative. The record as presented did not authorize a submission of the case to the jury. Other

questions not herein discussed and determined are left open.

Wherefore the judgment is reversed, with directions to set it aside, and to sustain the motion for a new trial and for other proceedings consistent herewith.