## Louisville & N. R. Co. v. Stephens.

April 28, 1944.

330

332

H. T. Lively, Samuel M. Wilson and Rouse, Price & Adams for appellant.

Northcutt & Northcutt for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

This action ·for the death of Jesse O. Stephens, a locomotive fireman, was brought under the Federal Employers' Liability Act, 45 U. S. C. A. section 51, and the appeal is from a judgment for $40,000 for the benefit of his widow.

A train of 110 cars left DeCoursey yards near Covington at 12:10 a. m., October 1, 1941. Two hours later, when the train had gone about 35 miles and while running about 25 miles an hour, a number of bolts holding

the crown sheet of the boiler in place gave way and caused a sudden rupture or opening which let the steam and water into the fire box. The crown sheet is that part of the boiler over and around the fire box. The escaping steam carried smoke, soot and some live coals into the cab. The explosion was due to insufficient water in the boiler.

The engineer, Frakes, testified that in some unaccountable way he got out the window of the cab. "My subconscious mind said to me, that's the nearest way of escape." He held on to a hand-hold above the window on the outside with his feet on a narrow ledge extending along the lower part. He reached back into the cab and shut off the steam as soon as he could. The train came to a stop in about a mile, which was its approximate length. The fireman, Stephens, and head brakeman, Ballinger, had been riding on the left side of the cab. Not being there when Frakes got back in the cab he walked down the side of the train. The conductor in the caboose, not knowing the cause for stopping, walked forward. They found Stephens, who was dead, and Ballinger, who was seriously injured, on the ground six or seven car lengths from the rear of the train. Stephens' skull was badly fractured and his arm broken. He had not been scalded or burned.

1. The appellant raises the question of the right of plaintiff to maintain the action under the Federal Employers' Liability Act. Other than the engine and caboose the train was wholly of empty coal cars. It was made up in DeCoursey yards, in the northern part of Kentucky, and destined for Corbin, in the southern part of the State. It was there broken up and the cars taken in other trains and distributed among the coal mines in southeastern Kentucky according to orders given at Corbin. There were cars of the appellant and other companies, many of which are foreign to Kentucky. Among these were 28 cars belonging to the International Harvester Company, which had been brought from Cincinnati terminals to the Kentucky yards of the appellant by other railroads. They were ultimately destined for the Harvester Company's coal mines for loading and return to its foundries outside of Kentucky. There was a continuous movement of these cars from the origin to destination, except as parts of different trains.

The appellant relies specially upon Louisville & N.

R. Co. v. Strange's Adm'x, 156 Ky. 439, 161 S. W. 239, and Illinois Central R. Co. v. Perry, 242 U. S. 292, 37 S. Ct. 122, 61 L. Ed. 309. Both cases involved local Kentucky freight trains and presented situations much like that in the case at bar. It was held in each that the action for the death of a railroad trainman could not be maintained under the Federal Act. Our case was decided in 1913 and the Supreme Court case in 1916. We shall not pause to consider them. In 1939 the Congress amended the Federal Employers' Liability Act to provide that any employee, "any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce," shall be considered as employed in such commerce and entitled to the benefits of the Act. The word "furtherance" has well developed meanings. Among others it is helping along as well as promoting or advancing; and in this context the word "affect" means to act or to produce an effect upon. Webster's Dictionary. The National Labor Relations Act, 29 U. S. C. A. section 151 et seq., defines the phrase "affecting commerce" as meaning anything that affects the free flow of commerce between the states. By its interpretation the Supreme Court has expanded that and other regulatory Acts of Congress so that few are the industries and employees not touched by the measuring rod of interstate commerce. It is held, for example, that burdens on interstate commerce can result from an intrastate act irrespective of the origin of the materials or the place at which it was done. National Labor Relations Board v. Henry Levour, Inc., 1 Cir., 115 F. 2d 105; cetiorari denied, 312 U. S. 682, 61 S. Ct. 550, 85 L. Ed. 1120. Of closer application is the decision of the Circuit Court of Appeals for the Sixth Circuit, in National Labor Relations Board v. West Kentucky Coal Company, 116 F. 2d 816, that within the Act are miners employed by a foreign corporation operating coal mines in Kentucky, which purchased most of its supplies and equipment and shipped the larger part of its production outside the state, selling it to interstate-railroad companies with which its mines were connected. A fortiori must it be held that moving cars coming from outside the state to coal mines for loading and transportation to other states is in furtherance of and substantially affects interstate commerce. See Louisville & N. R. R. Co. v. Jolly's Adm'x, 232 Ky. 702, 23 S. W. 2d 564;

certiorari denied, 282 U. S. 847, 51 S. Ct. 26, 75 L. Ed. 751. We are of opinion, therefore, that this action was maintainable under the Federal Employers' Liability Act.

2. The appellant argues that the court should have peremptorily instructed the jury to return a verdict in its favor because the cause of action alleged in the petition failed for want of proof. It is in two particulars. One relates to the cause of the bursting of the boiler and the other to the proximate cause of the injury.

(a) The plaintiff charged that "the defendant, its agents and servants, through gross and wanton carelessness and negligence in equipping, preparing, supplying and operating said locomotive engine, upon which plaintiff's intestate was then and there employed and engaged as a fireman, an explosion was caused to occur to and upon said locomotive engine and as a result thereof, the head of plaintiff's intestate was crushed and he was otherwise so mangled and injured that he instantly died."

The evidence proved there was a defective water glass, which is a device readily disclosing the stage of water in a boiler.

The Federal Employers' Liability Act specifically, imposes liability upon a carrier for injury or death of an employee "by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances * * * or other equipment." And the Federal Boiler Inspection Act, 45 U. S. C. A. section 23, enacted for the safety of employees, is to be read and applied with the Federal Employers' Liability Act, for therein is the remedy to be found. Baltimore & Ohio Railway Co. v. Groeger, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419; Napier v. Atlantic Coast Line R. Co., 272 U. S. 605, 47 S. Ct. 207, 71 L. Ed. 432. This Act makes it unlawful for any common carrier by railroad to use any locomotive unless "its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put." A rule promulgated by the Interstate Commerce Commission, under its authority to establish standards of compliance, has the force of law and becomes a part of the Act. Lilly v. Grand Trunk Western R. R. Co., 317 U. S. 481, 63 S. Ct. 347, 87 L. Ed. 411. "Whatever in fact is an integral or essential part of a completed locomotive, and all parts

or attachments definitely prescribed by a lawful order of (that body) are within the statute.'' Southern Ry. Co. v. Lunsford, 297 U. S. 398, 56 S. Ct. 504, 506, 80 L. Ed. 740. A list of various devices which the Commission had prescribed up to the time of the opinion in Napier v. Atlantic Coast Line R. Co., supra, is given in the margin of that opinion. It includes a water glass, gauge cocks and lamps in connection with them. It also appears in avowals in this record that the Interstate Commerce Commission has prescribed by Rules 37 and 42, issued under authority of the Boiler Inspection Act, that every boiler shall be equipped with at least one water glass and three gauge cocks, the lowest reading of which shall be not less than three inches above the highest part of the crown sheet, and that all water glasses must be supplied with a suitable and properly located lamp so that the engineer may easily see the water in the glass. There is a conflict of authority whether or not state courts take judicial notice of the safety appliance standards prescribed by the Interstate Commerce Commission. Thus it is held they do in Goulette's Adm'r. v. Grand Trunk Line, 93 Vt. 266, 107 A. 118, and Huckleberry v. Missouri Pac. R. Co., 324 Mo. 1025, 26 S. W. 2d. 980, and do not in Butler v. Illinois Traction, Inc., 253 Ill. App. 135, and Carter v. Industrial Commission, 76 Utah 520, 290 P. 776. It does not appear the documents offered in evidence on this point were properly authenticated. It is not necessary here to determine the question of judicial notice. Whether the regulations be regarded or not, we think this appliance, or one serving the same purpose, is so important as to be required as ''an integral or essential part of a completed locomotive,'' Southern R. Co. v. Lunsford, supra, and within the terms and scope of the statute itself. There was a continuing duty to provide such device with clear visibility.

The pleading that the defendant had been negligent in ''equipping, preparing and supplying'' the locomotive may well have been made more definite and specific upon demand, but it was sufficient for the introduction of evidence regarding the instruments. Harlan v. Wabash R. Co., 335 Mo. 414. 73 S. W. 2d 749. It was the equivalent of alleging that the defendant had negligently furnished the locomotive in a defective and unsafe condition. It was not necessary that the petition state the particulars in which there were unsafe or defective ap-

pliances. Kelly & Shields v. Miller, 236 Ky. 698, 33 S. W. 2d 662. Whatever deficiency there may have been must be regarded as cured by the judgment. Catron v. Jones, 281 Ky. 163, 135 S. W. 2d 419.

The defendant had equipped this engine with a water glass and three gauge cocks in apparent conformity with the law and regulations. The water glass is a tube about six inches long with vertical "V" corrugations on the inside. The evidence is that the corrugations become worn through the passage of water and steam and when so worn the visibility is clouded. While there is no evidence as to the condition of the water glass on this engine when it started on the trip, it is established, without contradiction, that immediately after the rupture of the crown sheet as described, the glass was cloudy and that it could not have become that way during the two hours the engine was in use. The engineer testified that he did not know there was anything wrong with the glass; that he had watched it as he went along in order that he might maintain a proper water level, and that it indicated at all times that he had a sufficient water supply in the boiler. To keep water in the boiler was his duty and not the duty of the fireman.

While it is the absolute duty of a railroad company to obey the provisions of the Boiler Inspection Act, and no notice, actual or constructive, of defects of an unsafe condition of the boiler need be proven, and a violation per se constitutes negligence, it must be found to be a proximate contributing cause of an employee's injury. 35 Am. Jur., Master and Servant, section 231; Robison v. Chicago & Eastern Ill. R. Co., 334 Mo. 81, 64 S. W. 2d 660; certiorari denied, 291 U. S. 682, 54 S. Ct. 558, 78 L. Ed. 1069; Larsen v. Northern Pacific R. Co., 175 Minn. 1, 220 N. W. 159; and Baltimore & Ohio R. Co. v. Groeger, supra, a boiler explosion case much like the one at bar. An action based upon that Act is not embarrassed by any defense of contributory negligence, because a railroad company is absolutely liable for injuries proximately caused by a failure to comply with its terms. Chicago, B. & Q. R. Co. v. Willard, 220 U. S. 413, 31 S. Ct. 460, 55 L. Ed. 521; Baltimore & O. R. Co. v. Groeger, supra; Ehalt v. McCarthy, Utah, 138 P. 2d 639. There is liability although there was no mechanical defect or inadequacy if any condition of the locomotive makes it unsafe to operate and involves "unnecessary

peril to life or limb." Lilly v. Grand Trunk Western R. Co., supra (317 U. S. 481, 63 S. Ct. 351, 87 L. Ed. 411). That opinion extends the scope of the act beyond previous decisions.

There is more than a defective device involved in this case. That was what deceived the engineer and must be deemed to have causal relation, but the fact remains that there was not enough water in the boiler. That was a matter of negligent operation, and the Employers' Liability Act deals with negligence. The rupture of the crown sheet under the proven circumstances proclaims negligence on the part of the Railroad Company. That is literally res ipsa loquitur doctrine, for the phrase literally means the thing speaks for itself. Sometimes it has been inaptly said that the accident speaks for itself. Louisville & N. R. Co. v. Grant, 223 Ky. 39, 2 S. W. 2d 1063. In this instance it is only the bursting of the boiler that speaks; and there is no exculpatory explanation. We do not think there was any variance between the pleading and the proof. The petition sufficiently pleads the death was the result of an explosion of the boiler caused by negligence of the defendant.

(b) The appellant presses with greater vigor the point that proximate cause was not proved. It is deduced from the evidence as to certain conditions and locations and the speed of the train that it had gone about 540 feet, with an interval of about one-third of a minute, between the moment of the explosion and when Stephens apparently struck the ground. It is submitted that he was not blown or knocked from the engine by the force of the explosion or the steam, and argued that the cause of his leaving the cab is speculative; that he may have slipped or been knocked off by Ballinger, the brakeman, in his haste to escape. It is pointed out that the plaintiff did not attempt to plead that the fireman's death was caused by his own act induced by an emergency created by the negligence of the defendant, but if that special plea should be deemed unnecessary it is submitted that there is no evidence that he jumped and fell on his head in order to escape; that the situation did not make it imperative that he abandon the train, for there were other practical and available means of escape from or protection against the cloud of steam.

It is true the evidence is only (1) that there was an explosion which filled the engine cab with steam, smoke

and embers, and (2) the finding of the dead body of the man on the ground close to the point of explosion, killed undoubtedly by falling upon his head. There is no explanation. Ballinger, the brakeman, did not testify. Is the reasoning from cause to effect but speculative? There seem to be only two alternatives, either he jumped or was knocked out by the brakeman. If the man jumped when it was not necessary to save himself, that is to be considered in the category of contributory negligence. Although it is hinted at, the appellant makes no claim to immunity from liability on the ground of remote cause if the fireman jumped and was killed by his act. See Louisville & N. R. Co. v. Shivell's Adm'r. 18 S. W. 944, 13 Ky. Law Rep. 902; Louisville & N. R. Co. v. Rains, 23 S. W. 505, 15 Ky. Law Rep. 423; Illinois Cen. R. Co. v. Vaughn, 111 S. W. 707, 33 Ky. Law Rep. 906; Interstate Coal Co. v. Love, 153 Ky. 323, 155 S .W. 746; Lexington Roller Mills Co. v. Fields, 182 Ky. 722, 20 S. W. 477. Life will have to be made over and human nature transformed before the law will say that a man confronted with instant choice between either remaining at his post and being scalded by steam from a bursted boiler or jumping from a train running relatively slow to escape, should have chosen what hindsight shows to have been the safer course, in order that one whose negligence created the situation should go free of responsibility. The effect of such action by the fireman does appear in the argument regarding the instructions and the amount of damages. It is mentioned here in connection with the primary negligence because the act of the brakeman, which the appellant claims was or may have been the immediate or proximate cause of the fireman's death, was of the same kind and done under the same impulse. We here examine that theory of the defense.

Attempts to define proximate cause comprehensively are not clarifying or satisfactory. It is sufficient to recall that the proximate cause of an injury is that cause which in natural and continuous sequences, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred. Louisville Home Telephone Co. v. Gasper, 123 Ky. 128, 93 S. W. 1057; 9 L. R. A., N. S., 548. What the brakeman may have done is to be measured by the same consideration as what the fireman may have done. His action was instinctive and spontaneous. There was no time for reflection or for the natural impulse to give

way to judgment or for him to stand back and wait for the other man. "Self preservation is the first law of nature" is a maxim accepted by all men. Do we not have here a match for the familiar landmark and starting point of the law of proximate cause, the famous Squib case (Scott v. Shepherd, 2 W. Bl. 892, 3 Wils. 403)? It will be remembered that if the last man who threw the squib had not thrown it, the plaintiff would not have been injured; that he threw it instinctively for his own protection and his act was justly regarded as the act of the defendant who threw it and as a continuation of the original force. So it is quite uniformly agreed that the mere fact that the intervention of a responsible human being can be traced between the defendant's wrongful act and the injury for which recovery is sought will not absolve the defendant; that he is answerable for all the consequences which are immediately and directly brought about by an intervening cause if it was set in motion by him as the original wrongdoer. 22 R. C. L. 134. Thus in Jackson v. Galveston, Harrisburg & San Antonio Ry. Co., 90 Tex. 372, 38 S. W. 745, a railroad company was held liable for the act of a locomotive fireman who jumped from a runaway train to avoid danger which he properly apprehended by reason of negligence of the engineer or because of defective brakes, and fell upon a section hand standing beside the track, who was the plaintiff in the action.

So if we should accept the tenuous theory that the frightened brakeman in his haste to escape and avoid death or injury to himself knocked the fireman from the engine, it would not lessen the effect or the force of the defendant's negligence. It was its negligence which set the brakeman in motion and caused him in the emergency to save himself. Fault cannot be imputed to him. The result of the negligence or initial wrongful act as related to the fireman was merely accelerated and passed on by the natural or instinctive action of the brakeman. The wave of causation or chain of cause and effect was not broken. The wrongdoer was the negligent master and not the frightened and excited brakeman. Therefore, we find no merit in the appellant's claim of immunity upon the ground of a failure of proof of proximate cause.

3. The appellant submits there is reversible error in relation to the instructions given and refused. In a large degree the particular arguments are disposed of by the views expressed with respect to a peremptory in-

struction. The given instructions predicated liability upon the finding by the jury that the defendant failed to equip the locomotive with "a sound and proper water glass which correctly registered or indicated the water level in the boiler of said engine at all times," or that the engineer was negligent in failing to keep the engine supplied with sufficient water, and that by reason of either failure or condition the crown sheet of the boiler became overheated so that a rupture or explosion occurred and the deceased was forced from the cab or caused to fall or jump therefrom. An instruction was given to the effect that if the deceased was confronted with a sudden emergency, caused by the escaping steam, and believed there was imminent danger to his person or life and in an effort to escape he, while exercising ordinary care for his own safety, failed to choose the safest course or means he was not guilty of contributory negligence. The instruction also provided that if the jury found him to have been guilty of contributory negligence it would not defeat recovery but would proportionately diminish the damages which might be awarded. With the addition of the factor of absolute liability because of a violation of the Federal Boiler Inspection Act, the instructions seem to have been patterned after Louisville & N. R. Co. v. Jolly's Adm'x, 232 Ky. 702, 23, S. W. 2d 564; certiorari denied, 282 U. S. 847, 51 S. Ct. 26, 75 L. Ed. 751, (Instructions to Juries, Stanley, section 535) and appear to be correct. We need not stop to examine them critically for, as indicated, we are of opinion that the plaintiff was entitled to a directed verdict without diminution in the award because of contributory negligence. This would have left only the question of the amount of damages to be submitted to the jury.

The instruction on the measure of recovery also followed that approved in the Jolly case, the provision with reference to dependent children being eliminated since there was no other dependent or person entitled to share in the recovery with the widow. It is as follows:

"If the jury find a verdict for the plaintiff, you will award her such a sum of money, the present cash value of which will fairly and reasonably compensate her during the period of her widowhood, for the loss or deprivation of such pecuniary benefits as you may believe from the evidence she had a reasonable expectation of receiving from the said Jesse O. Stephens had he not been killed.

"In determining the present cash value of the damages which you may award the plaintiff under these instructions, you will make your calculations on the amount of your award bearing interest at the highest net rate that the evidence shows can be had on money safely invested and secured. Your verdict however shall not exceed $75,000.00, the amount claimed in the petition."

The appellant criticizes the instruction, but it conforms to the standard. It offered an instruction providing for a recovery based upon such rate of interest as the jury might reasonably believe could be "ordinarily obtained from safe investments," and defining generally or giving the method for ascertaining the present worth of any reasonable sum award. It is submitted that under present economic inflation, with abnormally low interest rates, the standard described should have been used instead of "the highest net rate." It seems to us that the latter is more advantageous to the defendant than the former, for it is to be presumed that the jury understood that the calculations should not be limited over the period of prospective amortization to the present rate of interest. The Supreme Court, in Chesapeake & O. R. Co. v. Kelly's Adm'x, 241 U. S. 485, 36 S. Ct. 630, 60 L. Ed. 1117, L. R. A. 1917F, 367, which reversed our opinion in 160 Ky. 296, 169 S. W. 736; Id., 161 Ky. 655. 171 S. W. 185, points out that the Federal Employers' Liability Act makes no provision as to the method to be used in computing the amount of the award. Indeed, it is a judicial construction or the application of the criterion of damages used in the courts of the United States that establishes the measure to be the pecuniary damage actually sustained by the dependents, which in the case of a widow is the amount the deceased employee would reasonably have contributed to her as his wife during their joint lives. Thus, it is said in the Kelly case (241 U. S. 485, 36 S. Ct. 631, 60 L. Ed. 1117, L. R. A. 1917F 367): "The damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased (Citations). So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. It is self-evident that a given sum

of money in hand is worth more than the like sum of money payable in the future.''

The instructions in this kind of cases should not prescribe a formula for finding the present value of the pecuniary benefits which could reasonably be expected. Louisville & N. R. Co. v. Wingo's Adm'x, 213 Ky. 336, 281 S. W. 170. The instruction given is correct.

4. We regard the verdict of $40,000 so excessive as to require a reversal of the judgment.

The Federal Employers' Liability Act merely declares that a negligent carrier shall be liable in damages to the widow of a deceased employee or other dependent relatives. There is no restriction on the amount except that it shall be the damages actually sustained, diminished proportionately by the degree of contributory negligence, if any. The amount depends upon proof of the pecuniary assistance or support which the beneficiary or beneficiaries had reason to expect from the decedent and of which they have been deprived. This is to be determined according to the general common law as administered by the Federal courts, which strictly limits the recovery to the financial loss sustained. Several elements enter into the ascertainment by the jury, and, while no rigid mathematical formula can be followed, the approved measure of recovery, as indicated, is the present cash value of future benefits and the jury must be so instructed. Louisville & N. R. Co. v. Jolly's Adm'x, supra; 35 Am. Jur., Master and Servant, secs. 420, 519, 521. The character and habits of the deceased employee, the state of his health and mental and physical ability, his talents, his earnings from all sources and the part thereof which in the past he had used for or contributed to his dependents, and his reasonable life expectancy or that of the wife, if it be less, are all things properly to be considered. The present worth or cash value of the anticipatory pecuniary assistance is the sum to be awarded. The above computable factors, together with the earning power of money, which is regarded as the highest net rate of interest which may be earned from reasonably safe and sound investments, afford the coefficient for the calculations. 35 Am. Jur., Master and Servant, sec. 521; Annotations, 77 A. L. R. 1439; 102 A. L. R. 560; Louisville & N. R. Co. v. Holloway's Adm'r, 168 Ky. 262, 181 S. W. 1126, affirmed 246 U. S. 525, 38 S. Ct. 379, 62 L. Ed. 867; Chesapeake & O.

Ry. Co. v. Kelly's Adm'x, supra; Chesapeake & O. Ry. Co. v. Maggard's Adm'r, 193 Ky. 259, 235 S. W. 736; Director General of Railroads v. Chapman's Adm'x, 195 Ky. 364, 242 S. W. 365; Louisville & N. R. Co. v. Jolly's Adm'x, supra.

While a calculation based upon the above factors is not conclusive proof of actual pecuniary loss, it furnishes as fair a basis as can be suggested for considering the question of whether the verdict is excessive. Director General v. Chapman's Adm'x, supra. We examine the evidence upon those points.

The decedent was 43 years of age when he met his death. He was in good health, frugal and saving. He had no children but he and his wife had taken a baby into their home and treated her as their own child without adoption. She was 10 years old. The evidence concerning his earnings with the Railroad Company covered a period of five years, but in 1938 he received only a nominal sum and was undoubtedly employed elsewhere. The last year his earnings were $2,216.92. The average for the last two years was $2,069.25. We may accept for the present purpose the amount stated in the petition and the widow's testimony that he earned $200 a month. He and his wife used the money together and had saved enough to buy a small home and a little farm, title to which was taken in them jointly, with the right of survivorship. The property was worth about $4,850 above the indebtedness. We may disregard the part of his wages expended for the maintenance of the child, and for the purpose of testing the fairness of the verdict consider the decedent's contribution to his wife to have been one-half of his earnings or $100 a month.

His expectancy of life according to Wigglesworth's table was 24.77 years, and to the Carlisle table 25.71 years. An insurance actuary testified that because of the hazardous employment as a locomotive fireman his expectancy should be reduced between four and five years below normal.

An experienced banker, introduced by the plaintiff, testified that in his opinion the highest net rate of interest on money that might be securely and safely invested would be from 2 to 2½% per annum. This, however, was based upon Government bonds and he admitted that good, safe real estate loans might bear an average of 4¾%, and other investments possibly as much as

5%. We do not think it fair to accept the smaller rate, for it is to be remembered that we are looking over a period of probably a quarter of a century, and experience teaches that the present abnormal condition in the money market will not continue always.

Considering a very liberal expectancy of 26 years, with a rate of interest of 4%, the present value of an annuity of $1,200 would be $19,179.36, according to the "Present Table Value," published in Baldwin's 1936 edition of the Kentucky Statutes, page 2687. But that regards interest compounded annually and is not very fair. However, the gross receipts by the widow of $1,200 a year for 26 years would be only $31,200, or $8,800 less than the verdict. Another test is that $40,000 at 4% yields $1,600 a year, which is $400 more than the decedent had contributed to his wife. Accordingly, at the end of the period, the widow, or her estate, would have received the same annual pecuniary support she had during his lifetime and still have $40,000 plus accruals of $10,400. An insurance actuary furnished calculations of present values of an annuity payable in installments, spread over a period of 21 years and of 25 years, at the rate of 3% per annum. These give the factors of 15.415 and 17.4131, respectively. The computations on $1,200 a year would be $18,498 and $20,895, respectively. Using his entire average earnings for the last two years, $2,069.25, and the same factors, it develops that the present worth of the decedent's entire gross earnings would be $31,897 and $36,032, respectively. Therefore, it seems to us that by any fair method of computation, having regard at the same time for more intangible elements, the verdict must be regarded as excessive.

There got into the record evidence of reports made by the defendant to the Interstate Commerce Commission of the accident, and also some made by the engineer to his superiors. It is expressly provided by the statute that reports of accidents to the Interstate Commerce Commission shall not be admitted in evidence for any purpose in any action for damages growing out of any matter mentioned therein. 45 U. S. C. A., secs. 33 and 41. Reports made by the employees inter se are not competent evidence except perhaps to affect their credibility as witnesses. Should there be another trial of the case upon the merits, these reports should be excluded.

The judgment is reversed because of excessive damages.

Whole Court sitting.