**Willard GREEN, Plaintiff,**

v.

**The RIVER TERMINAL RAILWAY COMPANY, Defendant.**

No. C80–804.

United States District Court,
N.D. Ohio, E.D.

April 17, 1984.

Michael Occhionero, Cleveland, Ohio, Frank E. Van Bree, Chicago, Ill., for plaintiff.

George Moscarino, James Young, Joseph Castrodale, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

This matter comes before the Court on defendant's motion for a directed verdict under Federal Rule of Civil Procedure 50. Defendant moved for a directed verdict at the close of plaintiff's case, at which time the Court deferred its ruling. Upon the close of all the evidence, defendant renewed its motion. For the reasons outlined below, the Court grants defendant's motion.

### I.

Plaintiff, Willard Green, suffered injuries as the result of an unprovoked attack at the end of a work shift on September 29, 1978 by Jerald Dawson, a fellow employee at defendant, River Terminal Railway Company (River Terminal). Plaintiff, a conductor for River Terminal, began his shift around 8:00 p.m. on September 27, 1978. The shift was scheduled to begin at 3:00 p.m. but was delayed because the River Terminal employees had been honoring a sympathy strike for clerical workers at the Norfolk & Western Railroad. When the strike ended, River Terminal officials attempted to call in crews to resume operations at the railroad. Plaintiff, Dawson, and three other employees were called at home and told to report to work for job 210. River Terminal encountered difficulty in assembling a full complement of crews that evening due to the strike having just ended, and as a result only one crew, rather than the normal six to eight, reported to work.

Job 210's orders were to transport coal cars from the Norfolk & Western Terminal to the mills at the Republic Steel Corpora-

tion's mill in the Flats area in Cleveland.[1] Job 210 made four round-trips that evening. The crew on job 210 consisted of Willard Green, conductor; A.M. Gold, engineer; Jerald Dawson, fireman; Raymond Rabino, brakeman; and Ross Sizemore, brakeman.

When job 210 started A.M. Gold, the engineer, noticed a non-union crew, comprised of Republic Steel supervisory personnel who had been operating the engines during the strike, on another track. Gold refused to commence work while the non-union personnel were at the work site. The engine which job 210 was using was equipped with a two-way radio. The radio was placed on the engines to enable the yardmaster to give the crews orders, telling them what jobs they were to perform. If, for example, a load of coal were needed at the mill, the yardmaster would call the engine by number and speak to the engineer. The engineer would then contact the conductor, who would then communicate with the yardmaster in person, over the radio, or by telephone, to receive the job order. The receiver on the radio on Gold's engine was missing, so that while transmissions from the yardmaster could be heard by the engine, the personnel on the engine could not call back over the radio. Therefore, Green walked from the engine to the Harvard Avenue Yardmaster's office and placed a call to the Clark Avenue Yardmaster's office where he spoke to Mr. George Goble, the Trainmaster. Mr. Goble in turn contacted Patrick Kelley, the yard clerk, to stop the second engine.

Job 210 then commenced its work for the night. Early on, Green and Dawson got into an argument when Dawson asked if anyone knew what Bob Eliot made in pensions. When Green answered, Dawson called him a "liar." Later, job 210 passed an engine operated by Republic Steel fore-

men. As the two engines passed, Dawson called the men "scabs" and shook his fists at them. The crew continued its work over the evening. At one point Dawson offered Rabino and Sizemore beer from two cans of beer he allegedly had in his possession.[2] Still later, Dawson and Green got into another argument, this over social security payments and railroad retirement pay.

The crew's shift ended around 11:00 p.m. As the engine passed by the No. 5 Guard Station and the Harvard Yard office, Gold stopped the engine to let off Green and Dawson, who were not needed to put the engine away in the train yard. As the two men got off the train Dawson yelled to Green to get his son, who was a friend of Dawson's, and to come to the Forest City Tavern, where he threatened to beat them both up. Green proceeded into the Harvard Yard office, where he made a phone call to the Clark Avenue Office to inform them of an empty car out on the tracks and to inquire about where to deliver the crew's time slips. As he finished his call, Dawson walked in the Harvard yard office and without provocation began to strike Green with his hard hat.

Thereafter, Green brought the following suit, alleging causes of action for his injuries under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.* (1976) (F.E.L.A.) and the Locomotive Boiler Inspection Act, 45 U.S.C. §§ 22, 23 (1976) (the Boiler Act). In his Complaint, Green asserted the River Terminal was negligent in failing to exercise ordinary care to furnish plaintiff with a reasonably safe place of work, in failing to provide protection for the plaintiff in a potentially volatile atmosphere by permitting union and non-union employees to work together, and by failing to take action after Dawson exhibited threatening, erratic, and abusive behavior. Green also alleged that the radio was inoperable and in

---

1. The River Terminal Railway Company is a small railroad owned wholly by the Republic Steel Company. River Terminal serves as a link between the Class I railroads doing business with Republic Steel and the Republic Steel facilities. The distance of track covered by job 210

on September 27, 1978 was approximately one mile long.

2. The drinking of intoxicants while on duty is a violation of Rule G of the Book of Rules of the River Terminal Railway Company, and the penalties for violating Rule G include dismissal.

violation of the Boiler Act and was a cause of plaintiff's injuries.

## II.

The general standard governing the propriety of the grant of a directed verdict is whether sufficient evidence has been presented to raise a question of fact. The trial court, without weighing the evidence or passing upon the credibility of the witnesses, must view the evidence in the light most favorable to the party against whom the motion was made. Only if, having drawn from the evidence all reasonable inferences in favor of the opponent, the court determines that reasonable minds could not come to different conclusions may the motion be granted. *Coffy v. Multi-County Narcotics Bureau*, 600 F.2d 570 (6th Cir. 1979); *Morelock v. NCR Corporation*, 586 F.2d 1096 (6th Cir.1978), *cert. denied* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

 This standard, however, is inapplicable to matters involving the Federal Employers' Liability Act. The F.E.L.A. represents "an avowed departure from the rules of the common law" as a "response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety." *Sinkler v. Missouri Pacific Railroad Co.*, 356 U.S. 326, 329, 78 S.Ct. 758, 762, 2 L.Ed.2d 799 (1958). The Supreme Court has enunciated the following test for a directed verdict in F.E.L.A. matters:

Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also, with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry, whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities.

*Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 506–07, 77 S.Ct. 443, 448–49, 1 L.Ed.2d 493 (1957).[3]

Mindful of the Congressional intent behind the F.E.L.A. to provide a remedy for those employees injured in the course of their duties in the railroad industry, the lower federal courts have applied the *Rogers* standard liberally in favor of the employee. *See, e.g., Baker v. Baltimore & Ohio Railroad Company*, 502 F.2d 638, 643 (6th Cir.1974); *Missouri-Kansas-Texas Railway Company v. Hearson*, 422 F.2d 1037 (10th Cir.1970). The standard applied in such cases commands that a directed verdict in favor of a defendant employer be granted "only when there is a complete absence of probative facts" that any negligence of the employer may have played a role in the employee's injuries. *Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 360 (5th Cir.1980).[4] This does not mean, however, that an F.E.L.A. case may never be

---

**3.** The Locomotive Boiler Inspection Act, 45 U.S.C. § 23 (1976) is "substantively if not in form" an amendment to the F.E.L.A., *Urie v. Thompson*, 337 U.S. 163, 189, 69 S.Ct. 1018, 1034, 93 L.Ed. 1282 (1949), and must be construed in *pari materia* with the F.E.L.A. *Southern Railway Co. v. Bryan*, 375 F.2d 155, 158 (5th Cir.), *cert. denied*, 389 U.S. 827, 88 S.Ct. 82, 19 L.Ed.2d 83 (1967). Thus, the standard announced in the *Rogers* case applies to plaintiff's Boiler Act claim as well.

**4.** *Allen v. Seacoast Products, Inc.*, 623 F.2d 355 (5th Cir.1980) involved a cause of action arising under the Jones Act, 46 U.S.C. § 688 (1976). The standard for a directed verdict in Jones Act cases is the same as that in F.E.L.A. matters, *see Boeing Company v. Shipman*, 411 F.2d 365, 370 (5th Cir.1969) (en banc).

withdrawn from the jury. Although the court must permit all reasonable inferences to be drawn from the evidence presented, there exists an "essential requirement ... that mere speculation be not allowed to do duty for probative facts." *Tenant v. Peoria & Pekin Union Railway Co.*, 321 U.S. 29, 32, 64 S.Ct. 409, 411, 88 L.Ed. 520 (1944).

## III.

■ With this standard in mind, the Court will now proceed to examine all the evidence presented in the case. The F.E. L.A. provides, in part,

> Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment.

45 U.S.C. § 51 (1976). The general concept of "proximate cause" in common law negligence actions plays no role in F.E.L.A. cases, *Peymann v. Perini Corp.*, 507 F.2d 1318 (1st Cir.1974), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975), and it is sufficient if plaintiff proves that any negligence, however slight, plays any part in causing injury. *Hausrath v. New York Central Railroad Co.*, 401 F.2d 634 (6th Cir.1968). This does not mean, however, that an employer subject to 45 U.S.C. § 51 is an insurer or guarantor of safety of its employees. *Inman v. Baltimore & Ohio Railroad Co.*, 361 U.S. 138, 140, 80 S.Ct. 242, 243, 4 L.Ed.2d 198 (1959).

■ It is agreed that, at the time and place alleged in the complaint, the defendant was a common carrier by railroad, engaged in interstate commerce, and that the plaintiff was then an employee of the defendant engaged in such commerce. As an employer subject to the F.E.L.A., River Terminal was under a continuing duty to exercise ordinary care in furnishing the plaintiff with a reasonably safe work environment and to maintain that environment in a reasonably safe condition. Such a duty, however, does not exist in a vacuum. Whether a party is negligent depends upon the risk presented and whether the party should have realized that such a risk was indeed present and yet failed to take the appropriate steps.

Plaintiff claims that the defendant negligently failed to protect him from an intentional assault by a fellow employee. Two theories of liability have been developed in F.E.L.A. cases involving intentional assaults by fellow employees. Under the doctrine of *respondeat superior*, an employer is negligent within the meaning of the F.E.L.A. where an assault is committed by an employee in the course of the discharge of his duties and in the furtherance of the work of the employer's business. *Jamison v. Encarnacion*, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082 (1930). Thus, where a railroad employee in charge of the security of the railroad uses excessive or unwarranted force in the performance of his duties, the railroad may be liable under 45 U.S.C. § 51 for a resulting injury. *Slaughter v. Atlantic Coast Line Railroad Co.*, 302 F.2d 912 (D.C.Cir.), *cert. denied*, 371 U.S. 827, 83 S.Ct. 48, 9 L.Ed.2d 65 (1962). In the case at hand, plaintiff has neither alleged nor offered proof that Dawson's assault was in any way related to his duties as a fireman. Therefore, the Court need not consider whether River Terminal could be liable under such a theory of liability.

■ The second theory of liability holds an employer liable where the railroad fails to prevent reasonably foreseeable danger to an employee from intentional or criminal misconduct. *Harrison v. Missouri Pacific Railroad Co.*, 372 U.S. 248, 83 S.Ct. 690, 9 L.Ed.2d 711 (1963). Central to this theory of liability is the requirement that "reasonable foreseeability" exist that an assault might occur. In a number of cases where employees have attempted to hold their em-

ployers liable for intentional assaults by fellow employees, the plaintiffs have argued that the employer knew or should have known that the assailant had a propensity for violence.

To prove this knowledge, plaintiffs have brought forth evidence of prior criminal records of the assailant. The courts, however, have not been receptive to such a theory. If the criminal conduct which the employer failed to uncover bears little relationship to violent propensities, the courts have held that any negligence of the employer was not such that the employer should have reasonably foreseen the assault. *See, e.g., Lambert v. Morania Oil Tanker Corp.*, 677 F.2d 245 (2d Cir.1982) (conviction for unauthorized use of a motor vehicle); *Brooks v. Washington Terminal Company*, 593 F.2d 1285 (D.C.Cir.), *cert. denied*, 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979) (arrests for petty larceny and possession of drugs). No evidence has been presented in the instant case that Jerald Dawson had a criminal record of any sort, nor was any evidence of violent characteristics unearthed from Dawson's history. Thus plaintiff cannot argue that defendant was negligent in failing to reasonably foresee that Dawson would assault Green due to a failure to uncover similar acts of Dawson's in the past.

Evidence was presented at trial that Dawson was observed drinking a beer before his shift went to work and also drank one or two beers on the engine during the shift. Dawson's actions violated Rule G of the Book of Rules of the River Terminal Railway Company. Although the failure of either Green or Gold to take appropriate action with respect to Dawson's Rule G violation might constitute grounds for a finding of negligence were an accident to occur that might reasonably be foreseen to result from Dawson's drinking, there is no evidence in the case to suggest that River Terminal should have reasonably foreseen Dawson's later attack on Green from Dawson's drinking of a couple of beers. *See, e.g., Lambert v. Morania Oil Tanker Corp.*, 677 F.2d 245 (2d Cir.1982). Breach of company rules does not necessarily

equate with reasonable foreseeability that an individual will become violent. *See Brooks v. Washington Terminal Company*, 593 F.2d 1285 (D.C.Cir.), *cert. denied*, 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979).

■ That an assailant had argued with another employee prior to an attack does not necessarily lead to the conclusion that the defendant employer should have reasonably foreseen an attack. One cannot expect that all employees will have harmonious personal and professional relationships, and verbal arguments do not necessarily signal that violence will occur. In a number of cases where the plaintiff and assailant had had arguments in the past that were known to the defendant company, the courts have held that the company could not have reasonably foreseen the eventual assault. *See Sowards v. Chesapeake & Ohio Railway Corp.*, 580 F.2d 713 (4th Cir.1978); *Euresti v. Washington Terminal Company*, 280 F.2d 629 (D.C.Cir. 1960); *Harold v. Burlington Northern, Inc.*, 342 F.Supp. 862 (D.Minn.1972); *Bodner v. Cuyahoga Valley Railway Co.*, C81–410 (N.D.Ohio Sept. 10, 1981) (Contie, J.); *Taylor v. Missouri Pacific Railroad Co.*, 510 S.W.2d 735 (Mo.App.1974).

To be contrasted with these cases is *Harrison v. Missouri Pacific Railroad Co.*, 372 U.S. 248, 83 S.Ct. 690, 9 L.Ed.2d 711 (1963). In *Harrison*, the plaintiff was assaulted by a member of his crew whom he had accused of stealing a ballast fork. The evidence in the case was that plaintiff's supervisor had told him when he assigned the assailant to the work crew a few months earlier, "You will have to watch him because he is a bad actor and a trouble maker." The plaintiff had complained to the roadmaster about the assailant's acts of misconduct and refusal to follow orders during the two months prior to the assault. Finally, after the assault had taken place the roadmaster said to the plaintiff "I told you to look out for him. Now you got yourself in plenty of trouble." Based on this evidence, the Supreme Court held that,

**1026**

although the testimony was disputed, the defendant might have foreseen the attack and a jury verdict for the plaintiff should stand.

■ Plaintiff introduced evidence that Dawson argued with Green and other individuals throughout the course of the evening. Although the shouting and swearing might seem unnerving to the uninitiated, the arguments did nothing to presage violence. Both Green and Rabino testified that the employees of River Terminal argue a great deal and that the arguments between Dawson and the others that night were no different from other past arguments between crew members. Gold, Rabino, and Sizemore each testified that they were surprised and shocked to learn of the later incident between Green and Dawson.

When Green and Dawson left the engine at the end of the shift, Dawson supposedly told Green to find his son and come over to the Forest City Tavern where Dawson would beat them up. While such a statement seems to indicate impending violence, such a conclusion is rebutted by the statements and actions of both Gold and Green. Gold, who overheard the statement, stated that he had no reason to think that Dawson would strike Green and continued into the 900 yard to return the engine. Green testified that he was not put in fear by Dawson's threats. If none of the witnesses to the incident ever thought that Dawson's actions and statements foretold the eventual assault, then the Court must conclude that there was absolutely no reasonable foreseeability from Dawson's statements that he would later assault Green. With respect to Dawson's threats immediately preceding the fight, Green testified that he was not put in fear by Dawson's comments.

More importantly, River Terminal can only be liable if it should have reasonably foreseen that the assault was likely and then failed to take appropriate steps to prevent the attack. If there was not sufficient time to take any steps to prevent the attack, then River Terminal cannot be deemed negligent. *See, e.g., Euresti v.*

*Washington Terminal Company*, 280 F.2d 629 (D.C.Cir.1960). One must assume that an assailant must foreshadow his action sometime, however short, before the actual act. If that time is too close to the assault that the defendant could not have acted, then the defendant cannot be stated to be negligent in not having foreseen the assault and taken steps to prevent it.

In the case at hand, no evidence was presented from which a jury might infer that Dawson was likely to assault Green. None of the crew, including Green, ever expected that the attack might occur. In fact, all were surprised to learn of it. Nothing in Dawson's background or past work record gave the defendant the slightest indicia that Dawson might suddenly become violent. The Court, therefore, must find that River Terminal had no reasonable foreseeability that an attack might occur and as such that plaintiff's claim under the F.E.L.A. must fail as a matter of law.

**IV.**

■ Plaintiff has also alleged a claim against the defendant based upon the Locomotive Boiler Inspection Act, 45 U.S.C. § 23. The Boiler Act provides, in part,

It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb . . . .

45 U.S.C. § 23 (1976). First passed by Congress in 1911, the Boiler Act imposed liability upon the railroads for injuries caused by the presence of defective equipment. Negligence plays no role in cases under the Boiler Act—a railroad is absolutely liable once plaintiff proves that defective machinery and equipment played a role in the injuries complained of. *Lilly v. Grand Trunk Western Railroad Co.*, 317 U.S. 481, 485, 63 S.Ct. 347, 350, 87 L.Ed.

411 (1943); *Gowins v. Pennsylvania Railroad Company,* 299 F.2d 431, 433 (6th Cir.), *cert. denied,* 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962). Similarly, a plaintiff's contributory negligence is irrelevant to the issues to be decided in a case under the Boiler Act. *Bertrand v. Southern Pacific Company,* 282 F.2d 569, 573 (9th Cir.1960), *cert. denied,* 365 U.S. 816, 81 S.Ct. 697, 5 L.Ed.2d 694 (1961); *Louisville & Nashville Railroad Co. v. Stephens,* 298 Ky. 328, 182 S.W.2d 447 (1944).

Plaintiff argues that the defective radio prevented the removal of Dawson from the job crew and thus played a part in Dawson's assault on Green. Plaintiff also stated that had the radio been working there would have been no reason to enter the Harvard Yard office at the end of the evening, where Dawson assaulted him. Thus, plaintiff states that the radio was a "cause" of his injuries.

Defendant at the outset argues that the radio on the River Terminal engine is not a "part and appurtenance" within the meaning of the Boiler Act. River Terminal points to the evidence presented at trial that the radios were used only to communicate job assignments between the yard office and the engines. It states that, unlike other railroad operations, the radios were not used by the River Terminal crews to signal track switches and the movement of trains. It argues that the engines could be used safely without the radios, and at trial presented testimony that similar engines operating within the Republic Steel mills did not contain radios. Finally, the defendant points to the fact that the Secretary of Transportation, pursuant to his authority under 49 U.S.C. § 1655(e)(1)(C)(1976), has not promulgated any regulations governing radios on locomotives.

 It is clear that 45 U.S.C. § 23 does not encompass all accessories or devices which might be present on a locomotive. Rather, the statute governs only "whatever in fact is an integral or essential part of a completed locomotive, and all parts or attachments definitely prescribed by lawful order of the Interstate Commerce Commission." *Southern Railway Co. v. Lunsford,* 297 U.S. 398, 402, 56 S.Ct. 504, 506, 80 L.Ed. 740 (1936). Similarly, federal regulation of locomotive equipment under the Boiler Act is preemptive of any state or local regulation on the same subject. *Napier v. Atlantic Coast Line Railroad Co.,* 272 U.S. 605, 612–13, 47 S.Ct. 207, 209–10, 71 L.Ed. 432 (1926). Any attempt by a state regulatory body to require equipment not prescribed by federal regulation will fail, and a railroad's failure to use such equipment on its locomotives cannot become a basis of liability under the Boiler Act. *Marshall v. Burlington Northern, Inc.,* 720 F.2d 1149 (9th Cir. 1983).

 This does not imply, however, that any device not prescribed by the Secretary of Transportation cannot be the basis for liability under the statute. The Boiler Act speaks in the conjunctive—no locomotive shall be used unless all parts and appurtenances are in proper condition and may be employed without unnecessary peril to life and limb *and* all parts must be able to withstand any tests as may be prescribed by rules and regulations of the Secretary of Transportation.

The Court holds that the radio in question was covered by the Boiler Act. Although the radio's main use in River Terminal operations was not for switching, given the purpose of the Boiler Act and the liberal construction which the statute has uniformly been given, *Lilly v. Grand Trunk Western Railroad Co.,* 317 U.S. 481, 486, 63 S.Ct. 347, 351, 87 L.Ed. 411 (1943), it cannot be said that the radio is not an appurtenance which relates to the safety of operation of the engines. Testimony at trial indicated that River Terminal has had radios on its trains for a number of years, and their use cannot thus be deemed "experimental." That they were not used for switching operations does not indicate that the radio might not be used for safety purposes. If an emergency took place, be it a mechanical malfunction or a health-related problem of one of the crew members, the use of the radio could be crucial. Once

River Terminal made a conscious decision to put radios on its engines, it became obliged to see that they were maintained in proper condition.[5]

■ Defendant also argues that the Boiler Act is inapplicable because the engine was not "in use on its line" at the time Dawson assaulted Green. The absolute liability laid down by Congress under the Boiler Act applies only when an employee is injured while the engine is "in use", whereas the liability for negligence under the F.E.L.A. comes into play whenever the railroad is engaging in commerce. Reasoning that Congress intended that the stricter standard of liability of the Boiler Act apply only when the engine is actually in use on the railroad's lines, the courts have attempted to demarcate the temporal limits of the Boiler Act. *See, e.g., Lyle v. Atchison, Topeka & Santa Fe Railway Co.,* 177 F.2d 221 (7th Cir.1949), *cert. denied,* 339 U.S. 913, 70 S.Ct. 574, 94 L.Ed. 1339 (1950); *Simpkins v. Baltimore & Ohio Railroad Company,* 449 F.Supp. 613 (S.D.Ohio 1976). The distinction drawn by the cases attempts to set limits between the time when an engine has been taken off the line for repairs and when the engine is returned to service. *Compare Tisneros v. Chicago & Northwestern Railway Co.,* 197 F.2d 466 (7th Cir.), *cert. denied,* 344 U.S. 885, 73 S.Ct. 184, 97 L.Ed. 685 (1952), *with Holfester v. Long Island Railroad Company,* 360 F.2d 369 (2d Cir.1966); *Monongahela Railway Company v. Black,* 235 F.2d 406 (4th Cir.1956).

The Court concludes that the engine was "in use" on River Terminal's lines at the time plaintiff alleges that the defective radio caused plaintiff's injuries. This case presents a factual situation unlike all others concerning liability under the Boiler Act, and so analogy is difficult. However, under plaintiff's allegations, the radio would have been used at a time when the engine was indisputedly in use. That the eventual injury and damage did not occur until after the engine had been retired for the night does not detract from plaintiff's theory and does not convince the Court that the Boiler Act is inapplicable to the present case.

Thus, the Court concludes that plaintiff has alleged a claim under the Boiler Act. The Court, however, is unable to conclude that any evidence was presented at trial from which reasonable inferences could be made and a jury could conclude that the defective radio played any part in causing plaintiff's injuries. Although mindful that the concept of "proximate cause" plays no role in determinations under the Boiler Act, *Hausrath v. New York Central Railroad Co.,* 401 F.2d 634 (6th Cir.1968), the Court concludes that the defective radio cannot, under the facts presented into evidence, be deemed a cause of the assault.

Plaintiff attempted to show that had the radio been working, Gold, the engineer, would have called into the Clark Avenue Yard office and had Dawson replaced when Dawson started to argue with Green and to yell at the Republic Steel supervisory crew.

Q. Now, Mr. Gold, tell the jury, please if at any time during the entire tour of duty that night you ever considered relieving Mr. Dawson from duty.

A. Never.

Q. Did you ever consider reporting Mr. Dawson's conduct to any higher official of the railroad?

A. Yes, sir. And I told him so on that engine in front of everyone.

Q. Who would you have called to relieve Mr. Dawson from duty?

A. I would have called the crew dispatcher, and I would have called the Trainmaster.

---

5. *See, e.g., Seaboard Coast Line Railroad Company v. Jackson,* 256 So.2d 568 (Fla.App.), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 324, 34 L.Ed.2d 262 (1972). The Court respectfully notes a hesitancy to fully accept the reasoning and result in a number of other Boiler Act cases, *see, e.g., Whelan v. Penn Central Co.,* 503 F.2d 886 (2d Cir.1974); *Fritts v. Toledo Terminal Railroad Co.,* 293 F.2d 361 (6th Cir.1961). However, in the Court's opinion, it is beyond question that the radio at issue in the instant matter is an "appurtenance" within the meaning of 45 U.S.C. § 23.

Q. How would that have been done?

A. I would have had to do it by telephone.

Q. Why would you have had to do it by telephone?

A. The radio was out of order, and if I had to have the radio, I wouldn't have said anything to him to start with. I would have automatically called.

Q. When would you have done that?

A. At the first of the shift.

Q. What prevented you from doing that?

A. Cause I'm the man's boss, and I took it on my own discretion to tell him what to do and if he wouldn't have done it, I would have gone and called it on the telephone.

Later, on re-cross examination, Mr. Gold amplified his statements.

Q. You just told Mr. Van Bree that early-on, right before you started work, that if you had that radio, you would have called in to have to report Mr. Dawson. Is that true?

A. Yes, sir, that's true.

Q. That was as soon as you went to that engine and found that radio, you would have called at that time. Isn't that true?

A. Not—no, not about Mr. Dawson. Not until he flared up and made big loud curse words and jumped up and grabbed him by the—done like this with his hands, some kind of movement (indicating).

Q. When what that?

A. That was just before—a little after we was on the engine.

Q. It was before any activity took place so far as movement of that train that evening, wasn't it?

A. That's true.

Q. It was before your conductor went to talk to Mr. Kelley at the Yard office, who was sitting right in that Yard Office by the telephone.

A. That's true.

Plaintiff's assertion that Gold would have used the radio to relieve Dawson from duty is the only evidence that the radio was a cause of the resultant assault—no other member of the crew, including Green, ever testified that they had any thoughts towards disciplining or removing Dawson. While portions of Gold's testimony appear contradictory, the Court concludes that Gold would not have used the radio had it been working. Moreover, Gold's testimony indicates that Gold never intended to report Dawson or to have Dawson relieved from duty. Otherwise, at the time Dawson allegedly flared up, Gold could have told Green to inform Kelley of his misconduct.

The Court is convinced that, without taking into consideration the credibility of Gold's testimony, it is clear that the broken radio played no role whatsoever in Dawson's assault of Green at the end of the evening. *Black v. Penn Central Company*, 507 F.2d 269, 271 (6th Cir.1974).

 Plaintiff also urges that the defective radio was a cause of his injuries in that because the radio was broken he was required to enter into the Harvard Yard office to call Clark Avenue to find out where to take the crew's time slips. Had the radio been working, plaintiff testified, he would have contacted the yardmaster from the engine and would have had no reason to enter the Harvard Yard office, where he was assaulted by Dawson.

Although at first glance this "but for" argument possesses some weight, on examination it simply fails to meet a legal definition of causation. In *Turner v. Clinchfield Railroad Company*, 489 S.W.2d 257 (Tenn.App.1972), plaintiff sued to recover damages for personal injuries sustained when he fell on the steps of defendant's engine. Plaintiff had exited the engine because the toilet inside the locomotive was inoperative. Plaintiff alleged that the broken toilet was a violation of the Boiler Act and caused his injuries since he otherwise would have had no reason to leave the train. The court, however, held that the broken toilet did not cause plaintiff's fall but was merely a condition. Similarly, plaintiff's injuries in the instant case were caused by Dawson's assault. That the as-

sault occurred in the yard office is fortuitous, and the radio cannot be said to have caused the assault.

## V.

The issues presented in this case by defendant's motion for a directed verdict are troublesome and uncommon. The Court is not unsympathetic to the plaintiff, who suffered aggravating injuries as a result of Dawson's assault. However, upon an examination of the law governing F.E.L.A. and the Boiler Act and the testimony adduced at trial, the Court must reach the conclusion that defendant is not liable for plaintiff's injuries as a matter of law. No evidence was presented that the defendant should have reasonably foreseen that Dawson would assault Green. Every member of the crew stated that Dawson had no propensity to violence and that they were shocked and surprised to learn of the assault. Nor has any evidence been presented from which reasonable minds might infer that the defective radio was a cause of the assault. Therefore, the Court grants defendant's motion for a directed verdict on both plaintiff's F.E.L.A. and Boiler Act claims.

IT IS SO ORDERED.