COURT OF APPEALS

EIGHTH DISTRICT OF
TEXAS

EL PASO, TEXAS

 

 


 
 
 HANS HARRIS,
  
                            
 Appellant,
  
 v.
  
  
 BNSF RAILWAY COMPANY,
  
                            
 Appellee.
 
 
 §
  
 §
  
 §
  
 §
  
 §
  
  § 
  
 
 
  
 No. 08-11-00018-CV
  
 Appeal from the
  
 342nd
 District Court 
  
 of Tarrant
 County, Texas 
  
 (TC# 342-235434-09)
 
  
 
 


 

O
P I N I O N

            Appellant Hans Harris (“Appellant”)
appeals the trial court’s grant of Appellee BSNF Railway Company’s (“Appellee”)
motion for summary judgment as to Appellant’s cause of action for violation of
the Locomotive Inspection Act.[1]  Appellant’s sole issue is that the trial
court erred in granting Appellee’s summary judgment motion, as a matter of law,
by finding that a defective fuel gauge and in-cab display did not create an
unnecessary risk of personal injury.  We
affirm.

PROCEDURAL
BACKGROUND

            Appellant filed suit on January 12, 2009,
against Appellee, his employer, asserting causes of action under the Locomotive
Inspection Act[2]
(“LIA”) and the Federal Employer’s Liability Act[3]
(“FELA”).  Appellee filed a traditional
motion for summary judgment (“MSJ”) as to both causes of action, asserting that:
 (i) the defective fuel gauge on the
locomotive did not create an unnecessary peril to life or limb as required to
impose strict liability under the LIA; and (ii) it had conclusively negated the
common causation element of the two causes of action based on contributory
negligence.  Appellant filed a response.  The trial court heard arguments and orally
announced that the court was granting the MSJ as to the LIA claim, but denying
as to the FELA claim.  As it was the
trial judge’s last day on the bench, no written order was signed.

            Appellant filed a motion
for reconsideration of the oral ruling.  The
trial court granted Appellant’s motion and signed a written order denying
Appellee’s MSJ in its entirety.  Appellee
subsequently filed a no-evidence motion for partial summary judgment on the
FELA cause of action and a motion re-urging its original MSJ, to which
Appellant responded.  The trial court
heard arguments and took the motions under advisement.  Appellee then filed a motion for leave to
file supplemental evidence in support of its motion re-urging the MSJ.  The trial court denied the no-evidence motion
and the motion for leave to file supplemental evidence, and granted the motion
re-urging the MSJ as to the LIA cause of action, finding that “there is legally
insufficient evidence to support a finding that the defective fuel gauge and/or
fuel gauge display created an unnecessary danger of personal injury.”  The order denied the MSJ as to the “legally
insufficient evidence of causation” argument asserted by Appellee.  The same day the court signed an order on
Appellant’s motion to sever and abate the FELA claim, rendering the MSJ as a
final, appealable judgment on the LIA cause of action.  Appellant timely appealed.

FACTUAL
BACKGROUND

            Appellant was serving as a conductor on a
coal train operated by Appellee which was leaving the Saginaw, Texas rail yard (“Saginaw”)
near Fort Worth on January 1, 2008.  The
train engineer was Rocky Rhodes (“Rhodes”). 
In his deposition, Rhodes testified that he had not performed an
inspection of the train on the ground prior to departing the yard due to the
presence of a signed daily inspection card in the locomotive which indicated
that it had been inspected in Amarillo the previous night.  He stated that the inspection was valid until
12 a.m. on January 1, 2008.  The
locomotive’s fuel tank, which holds approximately 5,000 gallons of fuel, had
been filled in Amarillo the previous night. 
The locomotive had at least 2,000 gallons of fuel when it left
Saginaw.  There were three fuel gauges in
the locomotive: one was a sight glass on the fuel tank itself, where the fuel
level is gauged by looking at the fuel level in the tank; the second is an
analog dial gauge on the tank itself, operating on a float and registering the
fuel amount with a needle; and the third is a digital electronic gauge which
displays the fuel amount on a computer screen on the console in the
locomotive’s cab.  Rhodes testified that
on previous trips he has had conductors check the tank fuel gauges while the
train was in “operating mode.”[4]  The only way to do this is to lean over or
under the railing and look down, as that is where the fuel gauges are
located.  According to the deposition
testimony of Dana Maryott (“Maryott”), Appellee’s director of locomotives, the
digital gauges are the least reliable, though the analog gauges also fail with
some regularity.

This specific locomotive is serviced through
the Electromotive Division of General Motors. 
The locomotive is directed there every ninety-two days for scheduled
maintenance.  If a locomotive requires
unscheduled maintenance, Appellee’s manager of equipment operation questions the
locomotive’s crew to determine if there are any defects, which the manager then
classifies on a scale ranging from level one (very major) to level nine (very
minor).  According to Maryott’s
deposition testimony, level nine defects are not addressed in regulations
promulgated by either the Federal Railroad Administration (“FRA”) or the
Association of American Railroads.  Maryott
stated that level nine defects have no impact on a locomotive’s ability to
operate “safely and suitably,” and need only be addressed when convenient for
the Electromotive Division.  In an “exception
report” dated December 5, 2007, the locomotive was noted to have defective fuel
gauges and display, which were listed as level nine defects.  Maryott testified that in cases where there
is a high demand for trains, “you will see locomotives released with minor
defects back into service simply because we don’t have the time for a minor defect
that doesn’t impact operation . . . .”  Maryott testified that the gauges were not
important enough to be tagged out-of-service. 
Appellant noted that Appellee places such tags on defective water
coolers and toilets.  Rhodes testified
that the failure to place such a tag on the gauges is a violation of Appellee’s
policies, but also noted that he would not have immediately taken a locomotive
out of service for such a problem.

            Shortly after leaving
the Saginaw yard, as the train was approaching the Trinity River bridge, the
train went over an interlocker passage which was described as “rough.”  The yellow fuel pump light warning indicator
on the computer display then indicated that there were zero gallons of fuel in
the tank.  Rhodes “made an exclamation,”
informed Appellant that “that couldn’t be right,” and after Appellant inquired,
showed Appellant the gauges.  Appellant
and Rhodes discussed possible causes and the concern that the locomotive could
be losing fuel and that they could not have used that much fuel (the fuel it
had taken on in Amarillo).  Rhodes
commented “there’s no way.  Either we
ripped the bottom out of the fuel tank, or it’s just not reading right.”  Rhodes testified that there were two
possibilities of what happened, one being a mechanical problem with the gauge,
the other being that the fuel tank was ripped off or ripped open, which he felt
“wasn’t very likely,” as he “could see back, and I didn’t see fuel all over the
place.”  Rhodes asked Appellant whether
he had checked the fuel gauges in Saginaw, but Appellant did not respond.  At this point, Appellant left the cab on the
engineer’s side.  Rhodes noticed this and
assumed Appellant was leaving to check the gauges.  Rhodes continued to operate the train,
changing radio channels to inform a dispatcher that the train was approaching a
tower.  When Appellant did not return to
the cab, Rhodes looked back in his mirror and did not see Appellant on the
locomotive platform.  A few minutes
passed and when Appellant did not return, Rhodes stopped the train and went
outside to look for him.  As he exited
through the same door Appellant had used, Rhodes noticed blood on the walkway.  Rhodes radioed a dispatcher, advised that he
did not know where Appellant was, told him that there was blood on the walkway
and that he was in need of emergency assistance.  Rhodes began searching for Appellant and
eventually found him on the Trinity River Bridge, initially seeing him sitting
up, then lying with his head next to the rail and his legs hanging off the
bridge.  Rhodes noticed Appellant had a
severe injury to his head and rendered first aid until the paramedics
arrived.  There remains some dispute over
the exact manner Appellant was injured.  Following
Appellant’s injury, the gauges in the locomotive were repaired.  As a result of his fall from the locomotive, Appellant
suffered a broken neck, a closed-head injury, paralysis, memory loss, and
severe pain and discomfort.  Appellant
commenced his lawsuit on January 12, 2009.

DISCUSSION

            Appellant
presents one issue on appeal, specifically that the trial court erred in
granting Appellee’s traditional motion for summary judgment as to Appellant’s
LIA cause of action, when the trial court held that as a matter of law, the
defective fuel gauge and in-cab display did not create an unnecessary risk of personal
injury.

            We
review a grant of a traditional summary judgment de novo.  Travelers Ins. Co. v. Joachim, 315
S.W.3d 860, 862 (Tex. 2010).  We review
the evidence presented in the motion and response in the light most favorable
to the party against whom the summary judgment was rendered, crediting evidence
favorable to that party if reasonable jurors could, and disregarding contrary
evidence unless reasonable jurors could not.  See City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005); Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289
S.W.3d 844, 848 (Tex. 2009); Johnson v.
Brewer & Pritchard, P.C., 73 S.W.3d 193, 208 (Tex. 2002).  We indulge every reasonable inference and resolve
any doubts in the nonmovant’s favor.  20801, Inc. v. Parker, 249 S.W.3d 392,
399 (Tex. 2008).  A defendant who
conclusively negates at least one essential element of a cause of action is
entitled to summary judgment on that claim.  Frost
Nat’l Bank v. Fernandez, 315 S.W.3d 494, 508 (Tex. 2010), cert. denied, --U.S. --, 131 S.Ct. 1017,
178 L.Ed.2d 829 (2011); Tex.R.Civ.P.
166a(b), (c).

            The
LIA and FELA are interrelated federal statutory schemes.   When FELA cases are brought in state courts,
federal law governs the substantive rights of the parties, while state rules
govern procedural matters.  See St.
Louis Southwestern Ry. Co. v. Dickerson, 470 U.S. 409, 411, 105 S.Ct. 1347,
1348, 84 L.Ed.2d 303 (1985); Mitchell v.
Missouri–Kansas–Texas R. Co., 786 S.W.2d 659, 661 (Tex. 1990); Houghton v. Port Terminal R.R. Ass’n,
999 S.W.2d 39, 43 (Tex.App.--Houston [14th Dist.] 1999, no pet.)(noting same).  Under FELA, railroad carriers are liable for
damage to employees who suffer an injury “in whole or in part from the
negligence of any of the officers, agents, or employees of such carrier, or by
reason of any defect or insufficiency, due to its negligence, in its cars,
engines, appliances . . . or other equipment.” 
45 U.S.C.A. § 51 (West 2012).

In comparison, the
LIA provides that:

A
railroad carrier may use or allow to be used a locomotive or tender on its
railroad line only when the locomotive or tender and its parts and
appurtenances--

 

(1)  
are in proper condition and safe to operate
without unnecessary danger of personal injury;

 

(2)  
have been inspected as required under this
chapter and regulations prescribed by the Secretary of Transportation under this
chapter; and

 

(3)  
can withstand every test prescribed by the
Secretary under this chapter.

 

49 U.S.C.A. § 20701 (West 2012).

            FELA
liability is premised on negligence by the railroad, however small, and allows
for broader causes of action than the LIA. 
45 U.S.C.A. § 51; Rogers v. Missouri
Pacific R. Co., 352 U.S. 500, 508-9, 77 S.Ct. 443, 449-50, 1 L.Ed.2d 493
(1957); CSX Transp., Inc. v. McBride,
-- U.S. --, 131 S.Ct. 2630, 2636, 180 L.Ed.2d 637 (2011).  In comparison, the LIA imposes on the
railroad the absolute duty to maintain the locomotive, its parts and appurtenances,
in proper condition and without defects such that it is safe to operate without
unnecessary peril to life or limb.  Lilly v. Grand Trunk Western Railroad Co.,
317 U.S. 481, 485-86, 63 S.Ct. 347, 351, 87 L.Ed. 411 (1943).

A violation of the
LIA may be shown in one of two ways.  The
carrier may breach its duty to keep all parts and appurtenances in proper
condition and safe to operate without unnecessary peril, or, alternatively, the
carrier may breach a more specific duty by failing to comply with regulations
issued by the Federal Railroad Administration (“FRA”).  See McGinn v. Burlington N. R.R. Co., 102
F.3d 295, 299 (7th Cir.1996).  The LIA
(and its predecessor statute the BIA), are to be liberally construed to afford
protection to railroad employees and others by using safe equipment.  See Gregory v. Missouri Pacific R. Co., 32
F.3d 160, 161 (5th Cir. 1994).  The LIA
imposes an absolute and continuing duty on a railroad carrier to provide safe
equipment.  49 U.S.C.A. § 20701; Gregory, 32 F.3d at 161.  Under the LIA, it is not necessary to prove
that violations of safety statutes constitute negligence.  Proof that an employer violated the LIA is
effective to show negligence as a matter of law.  Houghton,
999 S.W.2d at 44, citing Urie v. Thompson,
337 U.S. 163, 189, 69 S.Ct. 1018, 1034, 93 L.Ed. 1282 (1949).  Strict liability under FELA results when a
rail carrier violates one of the Safety Appliance Acts,[5]
which include the LIA.  Thus, a railroad
whose employees are injured as a result of the LIA will incur strict liability
under FELA.  McGinn, 103 F.3d at 298-99.  If
a railroad chooses to install a piece of equipment that is not required-because
the equipment is not mandated by a federal regulation and does not constitute
an integral or essential part of a locomotive-then the railroad must properly
maintain that piece of equipment.  If it
fails to do so, and injury results, the railroad can be held liable for
violating the LIA.  Giebel v. Union Pacific R. Co., No. 08-CV-6294 (PJS/FLN), 2010 WL
1904921, *3 (D.Minn. May 11, 2010)(slip op.). 
In order to show a violation under the LIA, a plaintiff must show that
the complained-of-condition created a safety hazard.  Glow v.
Union Pacific R. Co., 652 F.Supp.2d 1135, 1143 (E.D. Ca. 2009), citing Oglesby v. S. Pac. Transp. Co., 6
F.3d 603, 610 (9th Cir. 1993).

Appellant argues
that the failure to keep the digital electronic fuel gauge and in-cab display
in proper repair violated Appellee’s general duty to keep all the appurtenances
in a safe condition and its specific duty imposed by 49 C.F.R. § 229.45.  This provision of the Code of Federal
Regulations addresses the general condition of locomotive safety standards, requiring
that:

All
systems and components on a locomotive shall be free of conditions that
endanger the safety of the crew, locomotive or train. These conditions include:
insecure attachment of components, including third rail shoes or beams,
traction motors and motor gear cases, and fuel tanks; fuel, oil, water, steam,
and other leaks and accumulations of oil on electrical equipment that create a
personal injury hazard; improper functioning of components, including slack
adjusters, pantograph operating cylinders, circuit breakers, contactors,
relays, switches, and fuses; and cracks, breaks, excessive wear and other
structural infirmities of components, including quill drives, axles, gears,
pinions, pantograph shoes and horns, third rail beams, traction motor gear
cases, and fuel tanks.

 

49 C.F.R. § 229.45 (2012).

While this
regulation lists a number of conditions, it is not intended to be exhaustive.  See
Diede v. Burlington Northern R.R. Co., 772 F.2d 593, 595 (9th Cir.
1985).  The railroad safety regulations,
in a section on prohibited acts, provides that the LIA makes it unlawful for
any carrier to use or permit any locomotive on its lines unless the “entire
locomotive and its appurtenances” are:  (1) in proper condition and safe to operate in
the service to which they are put, without unnecessary peril to life and limb;
and (2) have been inspected and tested as required by the regulations.  49 C.F.R. § 229.7 (2012).

            The
LIA does not define “parts and appurtenances,” leaving what is included in the definition
to be determined on a case-by-case basis. 
We have been unable to find any cases which address defective or
malfunctioning fuel gauges or in-cab displays in relation to either the LIA or
FELA.  Appellant argues that the fuel
gauge and in-cab display are “appurtenances” of the locomotive.  Appellee agrees, stating this is “a fact BNSF
has never disputed” and “does not dispute that a digital fuel gauge constitutes
an appurtenance.”  We agree.[6]

            Appellant
contends that Appellee breached both its specific duty under 49 C.F.R. § 229.45,
and its general duty to maintain the parts and appurtenances of the locomotive.

            The
FRA provides guidance regarding railroad safety regulations.  Chapter 8 of the Motive Power and Equipment
Compliance Manual (“Manual”) concerns “Railroad Locomotive Safety Standards”
under 49 C.F.R. 229.[7]  The Manual, in discussing 49 C.F.R. 229.45, states:

Conditions described as fuel, oil,
water, steam, and other leaks must be qualified by stating that they constitute
a personal injury hazard.  Insecure
attachments of those items such as third rail shoes or beams, traction motors
and motor gear cases and fuel tanks should have some relevancy to safety, or
have deteriorated to the point that it is immediately unsafe and could cause an
accident.  A locomotive should not be
cited for conditions described above if they do not constitute a hazard of any
type, but are merely technical in nature.  However, the railroad should be required to
correct the condition and bring the locomotive into compliance.  Any safety appliances not covered in Part 231,
such as steps and handholds that aid in sanding locomotives, safety railings, and
ladder treads affording access to the roof of the locomotive are covered by
this section.  Similarly, if the sander
hose or pipe has a hole in it that discharges sand at eye level, the Inspector
must establish the personal injury hazard under 229.45.  The Inspector must explain how the blowing
would cause the injury (e.g. sand blowing at eye level on locomotive walkway,
etc.). [I]nspectors should use this code if or when they find a handle missing
or the locking feature defective on locomotive air brake MU end-cocks, since
these conditions may affect the operation of the locomotive’s brakes.

 

Manual at Ch. 8 at 33-4.

 

This section of
the Manual specifically provides that the “FRA also believes that, ‘conditions
that endanger the safety of the crew, locomotive, or train’ provides the proper
and lawful limit to the application of this section.”  Id.
at 33.  The Manual also gives guidance
regarding 49 C.F.R. §§ 229.95 and 229.97, regulations concerning venting and
grounding fuel tanks, which is instructive:

There is no requirement for any type of
fuel level gauge at the fuel oil reservoirs. Generally, all locomotives have
fuel sight glasses of some type, but they are for the railroad’s convenience,
as is the automatic fuel shut-off equipment that is used when fueling
locomotives.

 

Manual at Ch. 8 at 48.[8]

 

            A
review of the pertinent sections of the Code of Federal Regulations indicates
that a defective fuel gauge, absent some malfunction or defect that would cause
a condition in the gauge itself that could endanger the safety of the crew,
would not violate the strict liability provision of 49 C.F.R. § 229.45.  The guidance in the Manual notes that there is
no violation of the statute if the conditions described in the regulation “do
not constitute a hazard of any type, but are merely technical in nature.  However, the railroad should be required to
correct the condition and bring the locomotive into compliance.”  Manual at Ch. 8 at 34.  Maryott testified that the worst consequence
that could happen relating to a malfunctioning fuel gauge is that the train
could run out of fuel and stop moving.  In
his deposition Appellant conceded this possible result.  Appellant testified that Rhodes could have
stopped the train and performed a physical inspection of the fuel tanks, and
that such a process would take about fifteen minutes.  Neither the Code of Federal Regulations nor
the Manual provide specific mention of fuel gauges, or their maintenance.  No evidence was presented that the
malfunctioning fuel gauge itself presented a danger or was unreasonably
dangerous or created an unnecessary risk of personal injury.  We find that the trial court did not err in
holding that as a matter of law, a defective fuel gauge in and of itself, without
evidence that the gauge defect itself is dangerous, does not violate the provisions
of 49 C.F.R. § 229.45.

            Appellant
also contends that Appellee breached its general duty to maintain the parts and
appurtenances in the locomotive.  He
argues that the fuel gauge indicated zero fuel in the tank shortly after
traveling over a “rough” piece of track (or interlocker) despite sufficient
fuel in the tank prior to departing the yard, and that an immediate
investigation was required.  Appellant
argues that he left the cab in the course and scope of his duties, and was
injured while leaning over the side to investigate the fuel gauge on the side
of the tank.  He also argues that the
defective fuel gauge placed him in unnecessary danger because he had to go
outside of the cab to check the fuel gauges on the tank to determine whether
the train was actually out of fuel.  An
expert opinion prepared on behalf of Appellant concluded that the defective
fuel gauge exposed Appellant to a risk of personal injury because:  (1) the locomotive was not actually out of
fuel; (2) the in-cab fuel display indicated a sudden loss of fuel because the
fuel gauge was defective; (3) a properly functioning fuel gauge would not have
caused the in-cab fuel gauge display to indicate a sudden loss of fuel; and (4)
therefore, Appellant would not have exited the cab to investigate.

However, as
Appellant acknowledges, a plaintiff attempting to prove a specific violation of
a duty must prove more than that the part or appurtenance failed to work
properly, but that the defect in the part or appurtenance presented “an
unnecessary danger of personal injury.”  See Glow, 652 F.Supp.2d at 1143.  As the Fifth Circuit noted in Gregory, the operation of a locomotive,
no matter how equipped, involves some danger to life and limb and accordingly
the LIA does not address all perils associated with operating locomotives, only
the “unnecessary” perils.  Gregory, 32 F.3d at 165.  Appellee cites Varney v. Norfolk and Western Ry. Co., 899 F.Supp. 280 (S.D.W.Va.
1995) in support of its argument that it did not breach its general duty under
the LIA.  The Varney court was concerned with an injury caused by a broken handle
on a removable radio.  In that case, the
court noted that conditions other than mechanical issues can render a
locomotive or appurtenance unsafe to operate. However the court found that the
broken strap on the radio handle did not render either the locomotive or the
radio itself “unsafe to operate.”  Varney, 899 F.Supp. at 281-82.

Here, there is no
evidence that the digital fuel gauge rendered the locomotive unsafe to operate “without
unnecessary danger of personal injury.”  See 49 U.S.C.A. § 20701.  Rhodes testified that a properly functioning
fuel gauge, though necessary for the seamless operation of a locomotive, does
not affect the safety of the crew.  There
is no evidence supporting Appellant’s claim that the defective fuel-gauge and
in-cab display created an unnecessary danger of personal injury as a matter of
law and we hold the trial court did not err so finding.

Having reviewed
the evidence presented in the Motion for Summary Judgment in the light most
favorable to Appellant, we find no error in the trial court’s granting of
summary judgment as to the LIA cause of action. 
Appellant’s sole issue is overruled.

CONCLUSION

Having overruled Appellant’s sole issue, we
affirm the trial court’s grant of summary judgment.

 

 

October 3, 2012

                                                                        CHRISTOPHER
ANTCLIFF, Justice

 

Before McClure, C.J., Rivera, and Antcliff, JJ.











[1]
This case was transferred from the Second Court of Appeals to this Court
pursuant to a docket equalization order entered by the Texas Supreme
Court.  See Tex.Gov’t Code
Ann. § 73.001 (West 2005).  We have applied precedent of the Fort
Worth Court of Appeals.  See Tex.R.App.P.
41.3.





[2]
Formerly known as the Boiler Inspection Act (“BIA”) 49 U.S.C. § 20701 et seq. (West 2012)

 





[3]
45 U.S.C.A. § 51 et seq.





[4]
That is, while the train is in motion and running at less 20 M.P.H.





[5]
45 U.S.C.A. §§ 1-43 (West 2012).





[6]
See Herold v.
Burlington Northern, Inc., 761 F.2d 1241, 1246-47 (8th Cir. 1985)(holding
that amber rotating beacon was a “part or appurtenance” in spite of the fact
that no regulation required its installation); Urie, 337 U.S. at 179, 69 S.Ct. at 1029 (track sanders are within
BIA); Tiller v. Atlantic Coast Line
Railroad Co., 323 U.S. 574, 577-78, 65 S.Ct. 421, 423, 89 L.Ed. 465
(1945)(headlight included under BIA); Lilly,
317 U.S. at 486-87, 63 S.Ct. at 351 (boiler spout is appurtenance under BIA); Chicago, Rock Island & Pacific Railroad Co.
v. Speth, 404 F.2d 291, 293 (8th Cir. 1968)(explosive warning torpedoes,
improperly placed on rack inside cab, are appurtenances under BIA); Southern Railway Co. v. Bryan, 375 F.2d
155, 157 (5th Cir.), cert. denied,
389 U.S. 827, 88 S.Ct. 82, 19 L.Ed.2d 83 (1967)(metal lifting eye designed to
assist locomotive getting back on track in event of derailment included under
BIA); Holfester v. Long Island Railroad
Co., 360 F.2d 369, 372 (2d Cir. 1966)(fuse, fuse box, its contents, cover,
latch and attachments included as appurtenances under BIA); Fritts v. Toledo Terminal Railroad Co.,
293 F.2d 361, 363-64 (6th Cir. 1961)(fireman’s seat is an appurtenance under
BIA); Bolan v. Lehigh Valley Railroad,
167 F.2d 934, 936-37 (2d Cir. 1948)(pilot step); Hines v. Smith, 275 F. 766, 767-68 (7th Cir. 1921)(automatic bell
ringer is an appurtenance); Green v.
River Terminal Railway Co., 585 F.Supp. 1019, 1028 (N.D.Ohio 1984)(radio); Zollinger v. Pittsburgh & Lake Erie
Railroad Co., 337 F.Supp. 913, 913-14 (D.C.Pa. 1972)(push-pole is an
appurtenance); compare King v. S. Pac. Transp. Co., 855 F.2d
1485, 1488 (10th Cir. 1988)(armrests are not integral or essential); McGinn, 102 F.3d at 299 (luggage racks
are neither integral nor essential).

 





[7]
Found at http://www.fra.dot.gov/rrs/downloads/safety/Compliance%20Manuals/Chapter8Aug2012.pdf





[8]
We also note that the regulations are specific regarding certain gauges,
including air pressure gauges (used as part of the brake system) and steam
pressure gauges (when used on steam trains). 
However, there is no specific safety regulation relating to fuel gauges.